## THE GAZELLE AND CARGO.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MARYLAND.

No. 73. Argued November 9, 12, 13, 1888. — Decided November 26, 1888.

A charter-party of a vessel to a " safe, direct, Norwegian or Danish port, as ordered on signing bills of lading, or as near thereunto as she can safely get and always lay and discharge afloat," requires the charterer to order her to a port which she can safely enter with cargo, or which, at least, has a safe anchorage outside, where she can lie and discharge afloat.

Findings of fact by the Circuit Court in admiralty, that a port to which charterers have ordered a vessel is one having a bar across its mouth, which it was impossible for her to pass, either in ballast or with cargo, and that the only anchorage outside is not a reasonably safe anchorage, nor a place where it is reasonably safe for a vessel to lie and discharge, are not controlled or overcome by a statement in the findings that many vessels have in fact discharged their cargoes at that anchorage.

The omission of the Circuit Court in admiralty to make any findings upon a fact put in issue by the pleadings can only be availed of by bill of exceptions.

A charter-party of a vessel " to a safe, direct, Norwegian or Danish port, or as near thereunto as she can safely get and always lay and discharge afloat," cannot be controlled by evidence of a custom to consider as safe, within the meaning of such a charter-party, a particular Danish port, which in fact cannot be entered by such a vessel, and has no anchorage outside where it is reasonably safe to lie and discharge.

If a charterer prevents the performance of the voyage by refusing to order the vessel to such a port as is designated in the charter-party; and the

master files successive libels for demurrage accruing under it, until the charterer files a cross libel contending that the master had committed a breach of the charter-party; and it is found, at a hearing upon all the libels, that the time required to perform the voyage stated in the charter-party would have been about the same as elapsed before the vessel procured another charter, that another charter was procured as soon as possible, and that the expenses of the vessel in port were not less than on the voyage — the shipowner is entitled to the whole of the stipulated freight.

In admiralty, if a libellant propounds with distinctness the substantive facts upon which he relies, and prays, either specially or generally, for appropriate relief, (even if there is some inaccuracy in his statement of subordinate facts, or of the legal effect of the facts propounded,) the court may award any relief which the law applicable to the case warrants.

THIS was an appeal from a decree in admiralty on cross libels for breaches of a charter-party of the Norwegian barque Gazelle, by which, on June 16, 1881, Herman Brun, her master, chartered her to Meissner, Ackermann & Co. for a voyage from Baltimore " to a safe, direct, Norwegian or Danish port, as ordered on signing bills of lading, or as near thereunto as she can safely get and always lay and discharge afloat," on the terms, among others, that the charterers should furnish a full cargo of refined petroleum in barrels, and pay freight of three shillings and three pence sterling a barrel; that the vessel should be loaded by July 6, and that demurrage of eleven pounds sterling should be allowed for each day's detention by their default.

On July 11, and August 1, 9 and 22, the master filed successive libels against the cargo, setting forth the making and the principal provisions of the charter-party, and annexing a copy thereof; and further alleging that the vessel was duly loaded by July 6, and on that day the charterers tendered to the master for signature bills of lading ordering her to the port of Aalborg, in Denmark, as the port of discharge, "to be landed at Aalborg, or as near thereto as the vessel can safely get;" that the master refused to sign the bills of lading, for the reason that Aalborg was not a safe port, and it was impossible for a vessel to enter it with cargo, or to land her cargo at the port or at any anchorage or landing-place near it, so as

always to lay and discharge afloat; and that he expressed to the charterers his willingness to perform the charter, and requested them to name a safe port, but they refused.

Each of those libels claimed demurrage according to the charter, amounting in all to $2070.20; the fourth libel claimed also $400 for the expenses of taking out most of the cargo; and each libel contained a prayer for general relief.

The charterers filed answers, admitting the making of the charter-party and the refusal of the master to sign bills of lading; alleging that the port of Aalborg is a safe port, well known to commerce, especially in the petroleum trade, and one to which vessels of deeper draught than the Gazelle are habitually despatched under charter-parties of like terms with that in controversy; and further alleging that, by the established and uniform usage and custom of trade between Baltimore and other Atlantic ports of the United States, and ports of Norway and Denmark, the port of Aalborg is recognized as being, and understood to be, a safe, direct port of Denmark, within the terms and provisions of such a charter-party; denying that there is no safe place or anchorage outside that port where the vessel could always lay afloat and discharge her cargo, or that there had been any detention of the vessel by their default; and alleging that the entire delay and the damages, if any, resulting therefrom, were due solely to the default of the master.

On August 20, the charterers filed a cross libel against the vessel, alleging the same matters as in their answers to the other libels, and claiming $8000 damages for breach of the charter-party, and general relief. The master filed an answer to the cross libel, presenting the same issues as the other libels and answers.

The District Court sustained the libels of the master, and dismissed that of the charterers, and entered decrees accordingly. 11 Fed. Rep. 429. The charterers appealed to the Circuit Court, which consolidated the cases, and made the following findings of fact:

"On June 16, 1881, the barque Gazelle, a sailing vessel of 571 tons burden, then in the port of Baltimore, Maryland, was

chartered by Herman Brun, her master, to Meissner, Acker-
mann and Company, of New York, for a voyage, as stated in
the charter-party, 'to a safe, direct, Norwegian or Danish port,
as ordered on signing bills of lading, or as near thereunto
as she can safely get and always lay and discharge afloat.'
Exhibit accompanying the libel is the said charter. Cargo of
3131 barrels of refined petroleum was put on board by char-
terers at Baltimore, and on July 6, 1881, the charterers ten-
dered the master bills of lading ordering the vessel to the port
of Aalborg, on the eastern coast of Denmark.

"The master refused to sign the bills of lading, on the
ground, as stated by him to the charterers, that Aalborg was
not a safe port for a vessel of the tonnage of the Gazelle, and
that no vessel of such tonnage could enter the port, even in
ballast, and that there was no anchorage near the port where
he could with safety lay and discharge. The charterers
refused to order the vessel to any other port. Conversations
and correspondence took place between the master and char-
terers and their agents. In all these the master insisted that
he could take the cargo to the port of Aarhus, which he said
was the only safe Danish port for a vessel of such tonnage as
the Gazelle, but he could not discharge at Aalborg or convey
the cargo there. The charterers, on the contrary, insisted that
he could and was bound to discharge at Aalborg. During this
discussion between the parties, and on one day, the master
said he would sign bills containing the words 'as near there-
unto as the vessel can safely get and always lay and discharge
afloat,' but on the same day, upon the charterers assenting to
this, he refused, saying, in effect, that as he knew the fact to
be that there was no place near Aalborg where he could safely
lay and discharge, and as he knew beforehand that he would
have to go to the nearest safe port, he would not sign any bills
of lading which might in any way commit him to anything
else. The charterers all this time insisted that he should dis-
charge at Aalborg, and did not agree to any receding from
this in assenting to add the above words on the bills of lading,
but still insisted on their right to have the vessel discharged at
Aalborg. Nothing was done in consequence of this proposi-

tion of the master, or of his subsequent refusal as aforesaid, which in fact altered the position of the parties in any way.

"The tonnage of the Gazelle was 571 tons, and she drew, when loaded, sixteen feet three inches, and in ballast, twelve feet. The port of Aalborg is in Denmark, on the south bank of the Limfiord, about seventeen miles from its mouth at the Cattegat Sea. At the mouth there is a bar about 2000 feet wide, on which there is ordinarily ten feet of water, and never more than eleven feet. Off the mouth of the Limfiord there is no sheltered bay, nor any indentation of the coast, but the coast runs in a straight north and south line. It was not possible for the Gazelle to pass the bar, either in ballast or with cargo, and the only place of anchorage for a vessel which cannot cross the bar is in the Cattegat Sea, off the mouth of the Limfiord, and the only mode of discharge at said anchorage is into small sailing coasters, which can pass the bar to the port of Aalborg and carry the cargo. A considerable commerce has been carried on with the port from time immemorial by vessels of very small draught able to cross the bar when loaded.

"Some steamers of larger draught have in late years traded regularly with the port from England. These have lighters expressly made for their purpose, which they take in tow going out, receiving from them part of their cargo when over the bar, and in returning discharge into them sufficiently to lighten to ten feet, and then tow the lighters in with them.

"Thirty-one cargoes of petroleum and grain have been exported to Aalborg from the United States since 1876; none before that time. Many of these were in vessels of such size as to be able to cross the bar after lightening a reasonable amount. Of these thirty-one vessels, two or three in all, of large size, have discharged their whole cargo outside.

"There existed at the time of the making of the charter a general custom in the Atlantic ports of the United States, with reference to charters similarly worded, that a ship may be ordered to any safe port within the range, where commerce is carried on, whether she can get into it or not, provided there is an anchorage near the port, customarily used in con-

nection with it, and where it is reasonably safe for the ship to lay and discharge.

" The port of Aalborg and the Limfiord inside the bar are safe for vessels that can get into them and lay afloat. The water inside the bar in the Limfiord is deep, except at or near the town of Aalborg, but the said anchorage outside the bar in the Cattegat is not a reasonably safe anchorage nor a place where it is reasonably safe for a ship to lay and discharge.

" The amount of freight under the charter for the cargo loaded was $3285.60. The master incurred expense of $507.03 in removing and storing the petroleum cargo after the refusal of the charterers to order the vessel to any other port than Aalborg, and $17.50 for wharfage and $16 for necessary towing.

" The time required to perform such a voyage as that stated in the charter would have been about the same time as elapsed before the vessel procured another charter, which other charter was procured as soon as could have been done, and on September 2, 1881, the vessel was ready to load under the recharter, and the expenses of the vessel in port were not less than on the voyage."

The Circuit Court stated, as conclusions of law, that the master was entitled to recover, for breach of the charter-party, damages in the sum of $3826.13, with interest from September 2, 1881, and that the libel of the charterers should be dismissed, and that they should pay the costs in both courts, and entered a final decree accordingly, from which the charterers appealed to this court.

*Mr. S. T. Wallis* and *Mr. Henry C. Kennard* for appellants.

I. The court below erred in failing to make a finding upon the issue joined as to the existence of a custom by which the port of Aalborg is recognized in all the Atlantic cities of the United States as a safe port, where vessels like the Gazelle go safely, and always lie and discharge afloat. It is not supposed that the previous rulings of this court as to the binding effect

of the findings of the court below release that court from the obligation to find on all the material issues presented by the pleadings. See *The Annie Lindsley*, 104 U. S. 185, 188; *Clark* v. *Fredericks*, 105 U. S. 4; *The Adriatic*, 107 U. S. 512; *The S. C. Tryon*, 105 U. S. 267, 270; *Prentiss* v. *Zane*, 8 How. 470, 484; *Patterson* v. *United States*, 2 Wheat. 221. The materiality of this issue cannot be denied. It is not necessary to discuss the validity of a custom under which an engagement to do an illegal or impossible thing might be supposed to be imported into a contract which was silent in regard to it. This court, speaking of contracts of affreightment, has said in the case of *The Harriman*, 9 Wall. 161, 162 that "if what is agreed to be done is possible and lawful, it must be done. Difficulty or impossibility of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot, by any means, be effected." If therefore, in view of the facts and possibilities admitted in the finding, as to the port of Aalborg and the course and experience of trade and navigation there, the appellee had specifically named that port in the charter-party, there is no room for doubt that he would have been bound to go there and unload, if he could. It would have been possible, and no illegality could attach to it. Clearly therefore a custom which would make the same obligation a part of his contract by necessary intendment would be equally unimpeachable.

II. The findings demonstrate the reasonable possibility of lying afloat and discharging cargo safely at the anchorage outside of the bar of the Limfiord, by showing that vessels do constantly, in fact almost every day, in trade, cast anchor in that locality, and discharge their cargoes in whole or in part without difficulty. In *The Alhambra*, L. R. 6 P. D. 68, it was decided that when a vessel is chartered to proceed with a cargo to a safe port as ordered, or as near thereunto as she can safely get, and always lie and discharge afloat, she is entitled not merely to have a safe anchorage outside the port, but to require that the port itself shall be one into which it is possible for her to get safely with her cargo, and lie and discharge afloat. It is doubtful whether this doctrine would be approved

by this court. In the case of *Dahl* v. *Nelson*, L. R. 6 App. Cas. 38, 43, 47, 51, where the whole subject is discussed, it was held, by the House of Lords, that the destination called for in the charter-party, by the language used, provided alternative destinations for the vessel, and it was substantially decided that a satisfactory port would be furnished if, either inside the port itself or at a reasonable distance outside, she could find a safe berth. And see, to the same point, *Capper* v. *Wallace*, 5 Q. B. D. 163; *Neilson* v. *Wait*, 14 Q. B. D. 516; *Carsanego* v. *Wheeler*, 16 Fed. Rep. 248.

It is true that the case of the *Alhambra* was not considered by the House of Lords when *Dahl* v. *Nelson* was before them, it not having been decided, on appeal, until March, 1881, while the decision in the House of Lords bears date in January preceding, but it is believed that a comparison of the doctrines laid down by the House of Lords with the law as determined in the *Alhambra* case, will show that the latter would not have been adopted by the tribunal of last resort if it had come up for consideration. The case in the House of Lords, being then still unreported, is not cited in the *Alhambra* case. It is not important, however, to consider how far the case of the *Alhambra* would be regarded as authority in this court, because the learned judge below has found that " there existed at the time of the making of the charter a general custom in the Atlantic ports of the United States, with reference to charters similarly worded, that a ship may be ordered to any safe port within the range where commerce is carried on, *whether she can get into it or not, provided there is an anchorage near the port, customarily used in connection with it, and where it is reasonably safe for the ship to lay and discharge.*" Under this custom it is not denied that it was within the right of the charterers to send the Gazelle to Aalborg, provided the anchorage outside was reasonably safe, and both parties must be presumed to have known of the custom.

The appellee contends that there is but one safe port in Denmark for a vessel of the Gazelle's tonnage, viz.: Aarhus, and yet it is manifest from the language of the charter-party — " a safe, direct, Norwegian or Danish port " — that the

charterers contemplated more than one. If, therefore, he desired to take no chances; if he desired to assume that what was constantly safe to other vessels would not be safe to the Gazelle; that the every-day experience of the port was not such as to justify him in taking the risk of the anchorage outside the Limfiord; it was his plain duty to say so, at the time the charter-party was entered into, and not expose the charterers to the loss and sacrifice of placing a valuable cargo on board, to be straightway unloaded and left on their hands at the port of shipment. It was neither frank nor fair for him to procure a charter by remaining silent under such circumstances, and enforce a restriction afterwards, which would have prevented the charterers from taking his ship if they could have anticipated it. He ought not to be permitted to lie in wait till he had the charterers in his power. Charter-parties are instruments more or less informal, and entitled to liberal construction in furtherance of the real intention of the parties and the usage of trade. *Raymond* v. *Tyson*, 17 How. 53, 59, 60.

It is supposed to be clear law, that when a vessel is chartered to go to a port or as near thereunto as she can safely get and always lay and discharge afloat, there is no restraint of her right to go to and enter a totally different port, provided it be the nearest safe port of discharge to the port of her destination. *Horsley* v. *Price*, 11 Q. B. D. 244.

When the contract of either party is broken, it is the implied duty of the other to do the next best thing, in order to prevent unnecessary loss. 2 Sedgwick on Damages (7th ed.), 118. If the master of the Gazelle had signed the bill of lading in the form admitted by the appellee in his libel to have been tendered him, he would not have prejudiced his own rights in any particular. If, upon arriving off the Limfiord bar, he had found any good and sufficient reason for not discharging outside, he could have lawfully gone to the nearest safe port for security. He would in fact have but conformed in that regard to the language of the charter-party itself. The master recognized this, for the court finds expressly, as already shown, that he agreed to sign bills of lading at one time containing

the words just above quoted from the charter-party, but that
for some unassigned reason he changed his mind, only repeat-
ing his previous allegation, "that there was no place near
Aalborg where he *could* safely lay and discharge, *and as he
knew beforehand that he would have to go to the nearest safe
port*, he would not sign any bills of lading which might in any
way commit him to anything else." These facts, however,
if they are facts, he was quite as fully aware of, when he
agreed to sign, as when he afterwards fell away from his
agreement. Nor can there be any better evidence than all
this that he was aware of his right to go to another port, if
he could not lie and discharge safely at the anchorage outside
of Aalborg. If he was right in his contention as to the insecu-
rity of the anchorage outside of Aalborg, he must be presumed
to have known that his failure to discharge his cargo there
would not impose upon him any responsibility for damages;
and that, on the contrary, he would be entitled to recover
from the shippers any loss he might incur by going first to the
mouth of the Limfiord and sailing thence, for sufficient cause,
to the nearest safe port. How, therefore, he could impair his
interests or lose any of his rights by signing the bills of lading
as requested, it does not seem easy to perceive. *Shield* v.
*Wilkins*, 5 Exch. 304.

III. The general principle regulating damages in cases of
this sort is too well established for controversy. The ship-
owner who is prevented from performing a voyage by the
wrongful act of the charterer is *prima facie* entitled to the
freight he would have earned, less what it would have cost
him to earn it. If he has earned or might have earned other
freights, or has or might readily have been benefited by the
opportunities which the cancellation or defeat of the contract
affords him, this must be taken into account. Scrutton on
Charter-Parties, 256–259. Of course indemnity is the guide
and principle in all such cases, and a man's loss by the breach
of a contract is only his net loss: *i.e.*, what he loses primarily,
less what he gains, or ought to have gained, incidently or
otherwise. If he gets, or might have got, a better charter, the
day after he lost the benefit of a previous worse one, he is

obviously gainer and not loser by the transaction. *Bailey.* v. *Damon,* 3 Gray, 96; *The Potomac,* 105 U. S. 630.

In *Wilson* v. *Hicks,* 26 L. J. (N. S.) Exch. 242, which was an action on a charter-party for not loading a cargo, and where the entire question was raised and discussed, Pollock, C. B., thus states the rule, on page 243: "The rule in all cases where the plaintiff seeks to recover damages for breach of contract, where the amount of damages depends on the conduct of the party, is, that, *prima facie,* he is entitled to the full measure of damages; but the jury are to take into consideration all the circumstances, and, if the plaintiff has acted unreasonably, then they may diminish the damages on that account. There is no rule of law that the plaintiff must necessarily recover the full amount of the freight, but it is a rule of law that the captain, in such cases, is bound to do what is reasonable, under the circumstances."

*Mr. Archibald Stirling* for appellee.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

The jurisdiction and authority of this court, in passing upon this appeal, are defined by the act of February 16, 1875, c. 77, § 1, by which the Circuit Court, in deciding admiralty causes on the instance side, is required to state its findings of fact and its conclusions of law separately; and a review of its decrees by this court is "limited to a determination of the questions of law arising upon the record, and to such rulings of the Circuit Court, excepted to at the time, as may be presented by a bill of exceptions prepared as in actions at law." 18 Stat. 315. The limit thus prescribed has been steadfastly upheld by this court against repeated attempts to escape from it. *The Abbotsford,* 98 U. S. 440; *The Benefactor,* 102 U. S. 214; *The Annie Lindsley,* 104 U. S. 185; *The Francis Wright,* 105 U. S. 381; *Sun Ins. Co.* v. *Ocean Ins. Co.,* 107 U. S. 485; *The Adriatic,* 107 U. S. 512; *The Connemara,* 108 U. S. 352; *Merchants' Ins Co.* v. *Allen,* 121 U. S. 67.

The record in this case consists of the pleadings, the findings of fact, the conclusions of law and the final decree.

By the express terms of the charter-party, the charterers were bound to order the vessel "to a safe, direct, Norwegian or Danish port, or as near thereunto as she can safely get and always lay and discharge afloat." The clear meaning of this is that she must be ordered to a port which she can safely enter with her cargo, or which, at least, has a safe anchorage outside where she can lie and discharge afloat. *Dahl* v. *Nelson*, 6 App. Cas. 38; *The Alhambra*, 6 P. D. 68. The charterers insisted upon ordering her to the port of Aalborg. The Circuit Court has found that Aalborg is in a fiord or inlet having a bar across its mouth, which it was impossible for the Gazelle to pass, either in ballast or with cargo; and that the only anchorage outside the bar is not a reasonably safe anchorage, nor a place where it is reasonably safe for a vessel to lie and discharge.

These positive findings of essential facts are in no way controlled or overcome by the other statements (rather recitals of portions of the evidence than findings of fact) that large English steamers habitually, and thirty-one American vessels in the course of several years, had in fact discharged the whole or part of their cargoes at that anchorage, without accident or disaster. A dangerous place may often be stopped at or passed over in safety. The evidence on the other side is not stated in the findings; and if it were, this court, in an admiralty appeal, has no authority to pass upon the comparative weight of conflicting evidence.

The Circuit Court has found that "there existed, at the time of the making of the charter, a general custom in the Atlantic ports of the United States, with reference to charters similarly worded, that a ship may be ordered to any safe port within the range, where commerce is carried on, whether she can get into it or not, provided there is an anchorage near the port, customarily used in connection with it, and where it is reasonably safe for the ship to lay and discharge." But the only anchorage near the port of Aalborg not being a reasonably safe place to lie and discharge at, that custom has no bearing on this case.

It has been strenuously maintained in behalf of the appellants that the Circuit Court erred in not making any finding upon the distinct issue, presented by the pleadings, whether by the uniform and established custom of trade between Baltimore and other Atlantic ports, and the ports of Norway and Denmark, Aalborg was recognized as being, and understood to be, a safe, direct port of Denmark, within the meaning of such a charter-party.

The answer to this position is twofold: 1st. It does not appear on this record that there was any proof of such a custom. If the appellants did offer such proof, and it was rejected or disregarded by the court, their remedy was by tendering a bill of exceptions, and thus making their offer, and the action of the court thereon, part of the record, which has not been done. *The Francis Wright,* 105 U. S. 381, 387. 2d. Evidence of a custom to consider as safe a particular port, which in fact is not reasonably safe, would directly contradict the charter-party, and would therefore be incompetent as matter of law. *Barnard* v. *Kellogg,* 10 Wall. 383; *The Alhambra,* 6 P. D. 68; *Hayton* v. *Irwin,* 5 C. P. D. 130.

The charterers, having refused to order the vessel to such a port as the charter-party called for, and having insisted on ordering her to a different one, were rightly held to be in default and answerable in damages; and the subject remaining to be considered is the amount of damages awarded against them, consisting of the whole amount of freight, and of the expense of taking out the cargo, and of wharfage and towing.

The material facts appearing upon the record, bearing upon this subject, are as follows:

The charterers having detained the vessel by their persistent refusal to order her to such a port as was described in the charter-party, the master, as he had a right to do, treating the charter-party as still existing, filed successive libels, claiming demurrage accruing under it, until the charterers filed a cross libel, contending that the master (who had only maintained the just rights of the owners) had committed a breach of the charter-party. It being then hopeless that the charterers

would perform the charter-party on their part, the master proceeded to take out the cargo, and the owners were entitled to freight. The Circuit Court has found simply that the time required to perform such a voyage as that stated in the charter would have been about the same time as elapsed before the vessel procured another charter; that another charter was procured as soon as could have been done; and that the expenses of the vessel in port were not less than on the voyage.

Nothing, therefore, is shown to take the case out of the general rule, that a ship-owner, who is prevented from performing the voyage by a wrongful act of the charterer, is *prima facie* entitled to the freight that he would have earned, less what it would have cost him to earn it. *Kleine* v. *Catara*, 2 Gallison, 61; *Ashburner* v. *Balchen*, 7 N. Y. 262; *Smith* v. *McGuire*, 3 H. & N. 554; *S. C.* 27 L. J. (N. S.) Exch. 465.

It is further contended that the court erred in awarding as damages the whole freight, amounting to $2285.60, under libels claiming only demurrage and expenses to the amount of $2470.20. But those libels set forth all the material facts ultimately found by the court, and each libel contained a prayer for general relief.

In the courts of admiralty of the United States, although the proofs of each party must substantially correspond to his allegations, so far as to prevent surprise, yet there are no technical rules of variance, or of departure in pleading, as at common law; and if a libellant propounds with distinctness the substantive facts upon which he relies, and prays, either specially or generally, for appropriate relief, (even if there is some inaccuracy in his statement of subordinate facts, or of the legal effect of the facts propounded,) the court may award any relief which the law applicable to the case warrants. *Dupont* v. *Vance*, 19 How. 162; *The Syracuse*, 12 Wall. 167; *Dexter* v. *Munroe*, 2 Sprague, 39; *The Cambridge*, 2 Lowell, 21.

*Decree affirmed.*