**ORE CARRIERS OF LIBERIA, INC., as Owner of M/V TYNE ORE, Plaintiff,**

v.

**NAVIGEN CORPORATION and Navios Corporation, Defendants.**

**No. 65 Ad. 216.**

United States District Court,
S. D. New York.

Aug. 1, 1969.

Haight, Gardner, Poor & Havens, New York City, for plaintiff; Charles S. Haight, Jr., New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendants; Edward L. Smith and David A. Nourse, New York City, of counsel.

METZNER, District Judge.

Ore Carriers of Liberia, Inc., the owner of the M/V Tyne Ore, sues to collect damages from the Navigen Corporation and the Navios Corporation, the time charterers of the vessel.

On November 5, 1962, the Tyne Ore collided with machinery owned by the Toledo, Lorain and Fairport Dock Company in the Black River in the Port of Lorain, Ohio. The ship was operating under a time charter to Navios Corporation, which had subchartered to Navigen Corporation. The vessel had been directed to carry a full cargo of ore from Port Cartier, Quebec, to the National Tube dock at Lorain. At the time of the collision, two pilots engaged by defendants—Stevenson and Powell—were on board the vessel, as were Dotson, a vice president of plaintiff, and Skelton, marine superintendent of defendants. All four testified on the trial in addition to the master and defendants' agent, Clements.

Under the charter parties, the defendants warranted a safe port and safe berth for the vessel. In addition, the pretrial order contained a stipulation that it was customary to use tugs for navigating in the Black River. Finally, the proof shows that the defendants undertook to obtain tugs to assist the vessel in navigating the Black River to the berth.

The use of tugs to aid in taking the vessel to its berth had been discussed several days before the voyage commenced. Dotson, when told that because of labor difficulties tugs might not be available, said that, subject to the captain's approval, he would have no objection to taking the boat up to its berth without tugs.

Defendants asked Clements, their agent, to arrange for tugs and the agent spoke to the towing company in Lorain. On both occasions he was told of labor difficulties, the possibility that tugs would not be available, but that the tower would do all possible to make the necessary arrangements. The agent hired Powell to pilot the vessel into the port since he had extensive experience in navigating the Black River. He told Powell that they would not know until the last minute, when the vessel was off the Lorain breakwater, whether tugs would be available.

Coming back to Dotson, we find that he was of the opinion, as the vessel approached the breakwater, that there was a "pretty good possibility" and "pretty strong chance" that tugs would not be available.

Powell testified on behalf of the plaintiff. He agreed that at the time he was employed by Clements he was told of the possibility that tugs would not be available. However, he says that if he had been told that there would definitely be no tugs he would not have taken the assignment. He also said that it would not be safe to proceed without tugs, although he could do it. That was a risk to be taken. At 5:30 on the morning of November 5, he came onto the bridge. The vessel was proceeding toward the breakwater. He called the towing company and was told that the tugs would be asked to come out, but the dispatcher said, "I don't know whether they'll cross this picket line or not." At this point, Powell began to have doubts that he would be getting tug service and so told the master. Despite this, Powell took the vessel through the breakwater at 7:05 at about 5 to 6 miles an hour. The distance from this point to the river entrance is only 1800 feet and the vessel is 545 feet long. Tugs usually pick up the vessels in this area, but there were no tugs there when the vessel entered the breakwater.

The master testified that he knew he needed tugs in the Black River and he relied on Powell to obtain them. The

night before, he was told that the tugs might be on strike. In his opinion, it was not safe to navigate the vessel in those waters without tug assistance. However, when he came on the bridge that morning, before they entered the breakwater, he did not ask Powell about the tugs. He made no inquiry, he said, because it was Powell's job to take them up the river. He never told Powell what to do if tugs were unavailable. Dotson, on the other hand, testified that he told the master that it was the latter's prerogative to proceed without tugs if none were available. He further testified that the master understood, since he took the vessel into the breakwater.

The master and the pilot represent the owner. They knew of the danger of going up the river without tug assistance. This does not exclude the possibility that the maneuver could be successful without tugs, but that is not the issue here. See The Gazelle and Cargo, 128 U.S. 474, 9 S.Ct. 139, 32 L.Ed. 496 (1888). They would not proceed without such assistance. Therefore, it appears that with their knowledge concerning the availability of tugs before they reached the breakwater, they should not have proceeded into the harbor.

Thus we have the warranties of the defendants as to the safety of the port and berth, and actions of the owner with knowledge of the facts. This case appears to be governed by the principles stated in Cities Service Transp. Co. v. Gulf Refining Co., 79 F.2d 521 (2d Cir. 1935), where the court said:

"If he receives that assurance but does not rely upon it and undertakes to sound for himself, both are at fault and damages are divided."

See also Paragon Oil Co. v. Republic Tankers, S.A., 310 F.2d 169, 173 (2d Cir. 1962).

■ Defendants have raised the question as to the competence of both the master and the pilot with regard to the navigational decisions made once the vessel entered the river. It is perfectly clear that the absence of tugs placed the

vessel in an emergent situation. The actions of both persons were not negligent under the circumstances.

It has been stipulated that the damages incurred by the plaintiff amount to $146,448.78. These damages shall be divided equally between the opposing parties.

The above shall constitute the findings of fact and conclusions of law.

*Judgment is directed accordingly.*

So ordered.