## Case No. 2,334.

### The CAMBRIDGE.

[2 Lowell, 21.] [1]

District Court, D. Massachusetts. July, 1871.

PLEADING AND PROOF IN ADMIRALTY — COLLISION — DAMAGES — DEMURRAGE.

1. In the admiralty practice of this country there is no rigid rule that a libellant in a collision cause, alleging one fault on the part of the defendant vessel, cannot recover on proof of a different fault.

[See The Martin Wyncoop, Case No. 9,177; The Havre, Id. 6,232.]

2. Some cases on this point examined.

3. Where the libel alleged only that the defendant steamer ported when she should have starboarded, and the evidence for the steamer proved that she was running at too great speed in a fog, and had no lookout forward, *held*, the libellant could rely on these faults as well as on those which he had alleged.

4. Where a vessel damaged by collision was sold at auction without sufficient examination of her condition, and without notice to the defendants, who had said they would do what was right about the collision, and it turned out that she might be raised and repaired conveniently and without a large outlay, *held*, the owners could not recover for a total loss, but that

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

the damages must be adjusted as upon a partial loss only.

[Cited in The Gazelle and Cargo, 128 U. S. 487, 9 Sup. Ct. 143; The Rabboni, 53 Fed. 957.]

[See The Catharine v. Dickinson, 17 How. (58 U. S.) 170.]

5. In assessing the partial loss, an allowance may be made for the salvage which would have been paid if the owners had procured her to be brought in and repaired. Demurrage allowed. at the rate of eight cents a ton of the vessel's carrying capacity for every day's delay.

In admiralty. Libel by the owners of the schooner Susan Ross against the steamer Cambridge for damage by a collision which took place on the night of the 15th of June, 1870, about ten miles from Monhegan light, on the coast of Maine. The night was foggy, and the wind light. The libel averred that the schooner was heading south by west, close hauled, had her lights properly set and burning brightly, and that a suitable fog-horn was constantly sounded; that her crew heard a steam-whistle and soon after saw the steamer bearing about south-west by west from the schooner, a little forward of the starboard beam, and distant about two hundred and fifty yards, and the master immediately fired a gun; that the steamer should have starboarded her helm, but ported, and ran into the schooner and sunk her.

The answer denied that the schooner had any lights but one white light in the binnacle, and a hand-lantern, and averred that the fog-horn was sounded only once; that the schooner was first seen on the port bow of the Cambridge; that the helm of the steamer was at once put to port, and the engines reversed, and every thing that was possible was done to avoid the collision; that the gun was fired too late to do any good. The pleadings contained no allegation concerning the speed of the steamer, or the state of her lookout; but the evidence for the defence showed that she was making her usual rate of twelve knots and more, and it did not appear that she had a lookout forward. The master of the steamer testified, that, when the night was foggy, he always calculated his position by the time he had been running, and always kept up his exact speed.

J. C. Dodge, for libellants.

E. D. Sohier & C. H. Drew, for claimant. The only fault set up in the libel is porting our helm; nothing is said about our speed or our lookout; they can therefore only recover if the collision was owing to this action of the steamer. Now, whichever way the helm had been put, we should have struck her. The fog was so dense that we could not have gone by on either side after seeing the schooner. The accident was inevitable.

LOWELL, District Judge. It has been ruled very often, that however unavoidable a collision may have been when the vessels first saw each other, it is their duty to take every possible precaution not to be brought into such a position. This rule required the schooner to have the red and green lights properly placed and burning brightly, and to sound a fog-horn as often as once in every five minutes, and perhaps oftener, when it was found to be necessary; and the steamer to keep a good lookout forward, to go at a moderate speed, and, when the schooner was heard or seen, to stop and reverse her engines, if necessary. There is very little doubt upon the evidence that the schooner had the lights and sounded the horn; and as little, that the steamer had not the lookout, was going too fast, and did not stop in season. Captain Johnson heard a horn, and, being uneasy at not hearing it again, slowed his engine and ported his wheel before seeing the schooner. It is to be regretted that he did not then reverse his engine, and wait until he was sure whether he ought to go to port or to starboard. It has become familiar not only to the profession practising in the admiralty courts, but to seafaring men, that one lookout man, at least, must be stationed forward; and the want of this precaution on such a night cannot be explained away by any evidence to show that the master and pilot would do as well, or better. Evidence of that kind, though admitted at circuit, by Taney, C. J., was overruled with something like scorn by the supreme court. Haney v. Baltimore Steam Packet Co., 23 How. [64 U. S.] 287; St. John v. Paine, 10 How. [51 U. S.] 557; The New York, 18 How. [59 U. S.] 223; Chamberlain v. Ward, 21 How. [62 U. S.] 548; The Ottawa, 3 Wall. [70 U. S.] 268. Then, again, the speed of the steamer was excessive. I have often had occasion to say that the owners and masters of steamboats must either comply with the statute, or procure its repeal. It is impossible for the courts to overlook a plain breach of the written law, upon any considerations of hardship in its application. It is useless to cite the many cases which show what is a moderate rate of speed for a steamer in a fog. No general rule has ever been attempted to be laid down but this,—that the speed should be such as will enable the steamer to avoid the other vessel after she shall be able to make her out. This test may seem a little too much like deciding each case by the event, and holding any speed too great where there has been a collision; but it has been adopted by high authority, both here and in England. See Dolner v. Monticello [Case No. 3,971]. I do not know that any test is universal; but this has the advantage of adapting itself to the density of the fog and the working qualities of the steamer, and will do, perhaps, for most cases. If it be true that the schooner was seen as soon as she became visible, and that it was then impossible to avoid her by any manoeuvre or combination of manoeuvres, then it would seem to follow that, the steamer should have

been in a condition to stop her headway more quickly than she could when running at her full speed of twelve and a half knots. All that I intend to decide here is, that this rate was too great.

It is argued that neither the speed of the Cambridge, nor her lookout, are put in issue by the pleadings, and that therefore she cannot be found in fault in these particulars. The proposition is sound, that in admiralty courts, as in all others, a plaintiff can recover only secundum allegata. This rule has had some rather singular applications; as where the owners of a vessel damaged by collision were permitted to recover one half their damages, but refused the other half because their pleadings and proofs did not correspond. This is the exact result of the decision of the appellate court in The North American, 12 Moore, P. C. 331. See further on this point, The Ann, 13 Moore, P. C. 198; The East Lothian, 14 Moore, P. C. 177; The Minnehaha, 15 Moore, P. C. 133; The Alice, 5 Moore, P. C. (N. S.) 300. These cases decide that a libellant shall not be permitted to aver one fault, and prove a wholly different or opposite one; as, if he says the other vessel starboarded, he shall not recover if she ported. But even in those courts, all that a vessel which has the right of way is bound to allege is, that she kept her course,. and the other party is then to show an excuse for the collision. The East Lothian, 14 Moore, P. C. 183, per Lord Chelmsford. In the Schwalbe, Swab. 523, the learned judge says, "The collision takes place at night. In darkness, and many important facts which bear upon the collision taking place on board one ship are unknown on board the other. Thus it cannot be known on board one ship what orders were given on board the other, what words passed, what lookout was kept, and so on. If these are discovered subsequently to pleading, there can be no wrong done in admitting evidence of them, if the other party has opportunity of giving his contradiction." Those remarks are precisely applicable to the case at bar, and fully answer the argument and citations.

In our courts the question is treated as a matter of evidence rather than of pleading. If surprise is shown, there may be reason for excluding the testimony, or for giving time to meet it. If the witnesses of one side vary the case from that which his pleadings set up, it may be a reason for disbelieving them. But it is the practice of our courts of admiralty rather to extract the truth, and found a decree upon it, whenever, by amendment or otherwise, justice can be fully done to both parties, than to follow any very strict rules of variance. The Quickstep, 9 Wall. [76 U. S.] 665; The Syracuse, 12 Wall. [79 U. S.] 173; Dupont de Nemours v. Vance, 19 How. [60 U. S.] 162; The Clement [Case No. 2,879]. I do not mean to say that this is not the practice in England. I think it is. The cases which seem to show a departure

from it are exceptional, and appear to have been decided without argument and upon their special circumstances. The true mode of declaring in collision cases is for each party to allege what happened on his own vessel; and he may, undoubtedly, add whatever he believes to have been done by the other; but he ought not to be held to prove too strictly the latter part of his allegations, in which he is liable to be mistaken. In this case, the owners of the schooner having alleged that they had the required lights, and sounded a horn, and did not alter their course, the steamer might be expected to set out what lookout she had, what her speed was, and what measures she took. This is done only in part. Upon the examination of her own witnesses the rest comes out, without any suggestion of surprise or any doubt of the truth of their statements. This brings the testimony within the points decided in The Quickstep and The Syracuse, ubi supra.

Were it not so, yet in this particular case the fault alleged in the libel appears to be made out. The steamer's helm was ported before the schooner was seen, and before her position was known; for the master testifies distinctly that he was uncertain where to look for her. In porting at that time, he took the risk of its being the right thing to do. If he had reversed his engine then, and starboarded when he saw the schooner, I have but little doubt he might have cleared her. The general statement by the master and pilot, that they knew of no other course which would have had any better result, must be taken to mean, as I apprehend, that they exercised their best judgment at the time. If it means more than that, and they intend to say that no measures could have prevented the collision, they are mistaken.

Interlocutory decree for the libellants.

A hearing was afterwards had upon the assessment of damages. The schooner had been towed to a place on the coast of Maine. The owners, by agreement with the salvors, held an auction sale of the wreck, and paid salvage on the amount realized, which was $1,250. The assessor's report tended to show that the schooner was bought by one Jackson, who raised her, and took her to a port about four miles off, where there was a marine railway, and there repaired her at a cost of about $1.300, making with the prime cost at the auction sale $2,550; and that she was worth, after repairs, about $4,000. There was some conflict in the evidence of value before the loss. The assessor found it to have been $4,500, which agreed substantially with the estimates of the present owners.

E. D. Sohier & C. H. Drew, for claimants. The damages should have been assessed on the principles of a partial loss. The Catharine, 17 How. [58 U. S.] 170.

J. C. Dodge, for the libellants.

LOWELL, District Judge. There is no doubt that the schooner was necessarily abandoned, and, if she had never again been heard from, the assessment must have been for a total loss. As she was brought in and repaired, the case is said by the claimants to be governed by The Catharine, 17 How. [58 U. S.] 170. There is besides, The Granite State, 3 Wall. [70 U. S.] 310. These cases carry the doctrine very far, that, when a vessel can be repaired, the measure of damages is the cost of the repairs. Indeed, the later of them seems to say that this rule may apply, even if the vessel is wholly lost; but the report is meagre, and this cannot be the meaning. The injured vessel may be in a place where repairs will be very difficult or very expensive, or where the master or owners cannot obtain the necessary funds. In short, the law must be, that whenever a prudent, uninsured, and unindemnified owner would sell a vessel injured by collision, she may be sold at the risk of the wrong-doer; and that the result to the purchaser cannot affect the damages, except as it may go to show a want of good faith in the sale.

An owner has no right to repair at the expense of the defendant in a collision cause, unless when a prudent owner would repair; and damages in such a case were limited to the amount of a total loss, although the repairs had cost much more. The Empress Eugenie, Lush. 138. I have had a similar case, which was affirmed on appeal,—The Glaucus [Case No. 5,478],—in which I gave a little more than a total loss, under the peculiar circumstances, but without impugning the general rule. This being so, it must follow that if the expenses of repairs will exceed the amount of a total loss, the owner may recover for a total loss; and it may be that where he honestly and prudently makes up his mind that the vessel is not worth repairing, he need not repair, but may sell and recover his whole loss. I understand that these qualifications are admitted in the recent case of The Baltimore, 8 Wall. [75 U. S.] 388.

But the owner must act with entire good faith and reasonable skill and prudence, else the loss which he seeks to recover may be due in part to his own conduct, and so cannot be assessed against the trespasser. There must be a necessity for the sale, like that, for instance, which would justify a master for selling his ship in a foreign port. I must say that I do not find such necessity to have been present here, nor even to have been supposed to exist. The managing owner seems to have determined on the auction sale for reasons of convenience, and as an arrangement between the owners and salvors, rather than with any regard to the questions now presented. It was, perhaps, thought that an auction sale is a fair and conclusive test of value; and it was undoubtedly accepted as such by the salvors; but they may have had reasons for haste in

disposing of this matter, in order to continue their voyage, or for some other reason. Now, I suppose it is very rare that a wreck lying on shore, and especially in a place where the extent of the damage cannot be seen, will bring its exact value. It may be more or less; but it is not one of those things that have a commercial standing; the bids must be very much a matter of speculation. If the wreck is worth raising, it will usually, I suppose, bring less than its true value. At all events, I am prepared to say, that when the owners are in a situation to repair the vessel, if she shall be worth repairing, they ought not to sell her, excepting at their own risk as to price, without a full examination into her condition. The managing owner swears, in this case, that, when he was bidding on the wreck, he supposed the injury to the timbers, &c., to be much greater than it was; and this is enough to show the impropriety of his course, so far as it affects the defendants, who had no notice of the sale, and who, as appears by the evidence before the assessor, had already declared their intention to do what was right in the premises. I hold, therefore, that the owners were wrong in not raising and examining the vessel before they undertook to fix her value by a sale. It is said that they were unable to raise her; but the buyer does not seem to have encountered any special difficulty in that respect. The salvors had no right to object to her being raised and examined, and do not appear to have offered any opposition to it. The circumstances bring the case within what I suppose to be the decision in The Catharine, and the loss must be assessed as partial.

I cannot agree with the claimants, that, in making up a partial loss, the allowance for salvage will be only what was actually paid to the salvors. That payment was based on the sale, which cannot be affirmed in part and annulled in part. It is fair to assume, that if the vessel had been known to be worth more, the salvage would have been higher. In making up the damages on a theoretical basis, the owners must have the advantage of this difference.

The witness to demurrage estimates it at $18 a day; but he says, at the same time, the eight cents per ton of carrying capacity is the rate always stipulated for in the coal trade, which is a very large business, and employs a great number of vessels of the class of the Susan Ross; and, as her tonnage for coal is said to be one hundred and eighty tons, this would make $14.40 a day, if the vessel were manned; from this must be deducted whatever the expense of the crew would be, which, I should suppose, would reduce the cost nearly one half. I was not asked to assess the damages, but only to recommit the report, if a new assessment should be necessary. I only give my views as an approximation and a guide to the assessor.

Pro Forma Assessment.

| | |
|---|---|
| Cost of repairs made................. | $1,300 |
| Damages not repaired................. | 400 |
| Demurrage for four weeks, at $8 per day | 224 |
| Salvage (estimate) ................. | 1,250 |
| | $3,174 |

I do not know precisely what the damages will prove to have been, but I should suppose the above estimate a liberal one.

Report recommitted.

NOTE [from original report]. The rate of demurrage above allowed has been often agreed upon for vessels of this class in collision cases.