### DAVIS v. ADAMS.

#### (Circuit Court of Appeals, Ninth Circuit. May 21, 1900.)

#### No. 575.

1. ADMIRALTY PRACTICE—EFFECT OF VARIANCE—AMENDMENT OF PLEADING.

In the courts of admiralty of the United States there are no technical rules of variance which will prevent a recovery by a libelant who shows a meritorious case, but under the liberal and equitable practice as to amendment he will be allowed to amend his pleading at any stage of the case to conform to the evidence, even to the extent of changing a libel for a tort to one based on contract, where he has mistaken his legal rights, and the allowance of such amendment will work no hardship to the defendant, and is in accordance with the principles of equity and natural justice.

2. SAME—SUIT BY SEAMAN.

Libelant brought suit in personam to recover damages for alleged forcible detention on board a vessel by defendant, where he was induced to go through false pretenses, and for services rendered while so detained. The evidence showed that he went on board under shipping articles which he had voluntarily signed, and by which he was bound, but that he was wrongfully forced by the master to leave the vessel at a distant

port, in violation of such articles, and was refused any payment for the services rendered; and also that he suffered other wrongs and mistreatment at the hands of the master which gave him a right of action in personam against the defendant. *Held*, that he should have been permitted at the close of the case to amend his libel to state his cause of action as disclosed by the evidence.

Appeal from the District Court of the United States for the Northern District of California.

In Admiralty. On March 13, 1899, a libel was filed by the appellant in the district court of the United States for the Northern district of California, in personam, against William J. Adams, appellee herein, as owner of the barkentine Retriever, to recover damages not very clearly stated, but which appear to be claimed as wages for services rendered on board the vessel for one month at $35 per month; also damages at the rate of $35 per month for 14 months after the appellant had been discharged from the vessel, and while he was unable to obtain other employment; also damages for amount expended for board and lodgings during the latter period at $20 per month, and for damages by reason of exposure and want of necessary food and clothing in the sum of $2,000. According to the testimony on the part of the appellant, the facts are these: On May 10, 1895, and while a strike of the sailors' union was in progress in the port of San Francisco, rendering it very difficult for shipowners and masters to secure the services of seamen, the appellant, who never had been to sea, was approached by one John Curtin, who asked him if he wanted a job, and introduced him to Capt. Bogan, master of the Retriever. He was induced by said Curtin and Capt. Bogan to sign papers, which were represented to him to be only for the purpose of giving the person before whom the same were signed, purporting to be a United States shipping commissioner, something by which the said alleged shipping commissioner could keep track of him. Capt. Bogan told him, when he demurred to going on board ship for want of experience, that all he would have to do would be to help load lumber, and that he would receive therefor $25 per month and board. Under these representations, appellant went on board the Retriever, then at anchor in the Bay of San Francisco. Five days thereafter, having then secured a full crew, the vessel proceeded upon her voyage to Port Hadlock, on Puget Sound, and during the trip the appellant remained on board, cleaning woodwork, sawing wood, and performing such other work as was required of him. On the voyage he suffered much hardship in consequence of not being supplied with proper clothing, and from the fact that he had no bedding at all, both of which the master had represented to him would be furnished him on board the ship; and generally harsh treatment was accorded the appellant and all the members of the crew save two, Harry Baker and William Baker, witnesses for the appellant, who were the only experienced sailors on board. William Baker testifies that the mate said to him, five or six days after they had left port, referring to the port of destination, that they "were going to run them all ashore there." And at about the same time the master said to Harry Baker, referring to all the inexperienced men, that "he wanted to get rid of them on the Sound"; and again, that "he wanted to get rid of them on the Sound, and ship some sailors on the return voyage." The appellant says that a short time before the vessel's arrival at Port Hadlock the master said in forcible language, 'I am going to put a plank ashore, and I want every one of you to leave the moment the anchor drops," whereupon the mate said to the appellant, "That means you, too," to which the appellant replied, "I am not going to leave this vessel until she takes me back where she took me from." And it appears from the testimony of Harry Baker that all of the crew but the two Bakers did leave the vessel at Port Hadlock, and the Retriever returned to San Francisco with a crew of experienced seamen. Upon arrival at Port Hadlock the vessel was beached, and the appellant, among others, was compelled to stand in the water, which was very cold, to paint the ship's bottom, which exposure caused him severe

physical suffering. He finally told the first mate, under whom he was working, that he could stand it no longer. The mate snatched the tools out of his hands, raised a brush as if to strike him, and in profane language told him to "get away from here." Upon attempting to work under the second mate, he received similar treatment, and was then again driven away by the first mate. Thereupon he applied to the master for his pay, and the master replied: "You don't suppose you are going to get any pay, do you? You have got your pay. You had your board." This was just at the dinner hour. The appellant went on board, got his dinner, took his clothes, and went ashore. The next day he made his way to Port Townsend with some difficulty, and thereafter (the record does not disclose when) returned to San Francisco. The appellee, in his answer, denies generally the averments of the libel, and contends that the appellant deserted the Retriever at Port Hadlock, after having entered into a contract with the master to ship for the voyage, and, under the terms of said contract, is entitled to no remuneration for the services rendered by him. Capt. Bogan testifies that he first saw the appellant on board the Retriever; that he worked during the trip to Port Hadlock, doing what he was told to do; and that he was not paid for his services. The cashier of the Shipowners' Association of San Francisco testifies that he enrolled the appellant in the register kept in the office of that association at that time; that he does not positively remember, but thinks, from the articles, that the crew signed them in the office. The only other evidence introduced by the appellee is the shipping articles, from which it appears that the crew of the Retriever signed for a voyage not to exceed six months in duration, between San Francisco as the home port and Port Hadlock. The articles contain the usual stipulations, among which are the following: "And it is herein expressly agreed, without reservation of any sort, that in case of the desertion from the vessel of any of the crew, the said persons so deserting shall forfeit to the owners of the said vessel all the wages due them." "It is expressly understood that these shipping articles shall be construed to be a civil contract between the master of the vessel and the members of the crew, and that the essence of the contract is the undertaking of each member of the crew to complete the specified voyage before becoming entitled to any portion of his pay." The appellant, upon cross-examination, admitted that he signed these shipping articles, and agreed to go upon said voyage, his compensation to be $25 per month. The court below, in its opinion, held that, while the appellant was justified in leaving the ship, the libel should be dismissed, as there was a fatal variance between the case proven and the cause of action set up in the libel. The libel was, by the decree, accordingly peremptorily dismissed. (D. C.) 93 Fed. 977. From this decree an appeal has been taken to this court.

George F. Shelton, for appellant.
Charles E. Naylor, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the case as above, delivered the opinion of the court.

A consideration of the evidence in the case fails, we think, to sustain the contention of the appellant, as expressed in his libel, that he was induced by false and fraudulent pretenses to go on board the ship Retriever, and was then forcibly detained there. It appears from the record that the appellant, who had been a university student, signed shipping articles of the usual and regular form for a voyage on said vessel, and that he thereafter voluntarily went aboard the vessel and performed such duties as were assigned to him during the voyage to the port of destination, Port Hadlock, where he left the vessel.

The next question that arises is, was the appellant justified in leaving the ship? That is to say, under the facts of this case, was he, in effect, discharged at Port Hadlock? The circumstances of his leaving the vessel are fully set forth in the foregoing statement. The only testimony on the part of the appellee in relation to this point is that of Capt. Bogan, who says, referring to the appellant, "He left the ship." The appellant's testimony, on the other hand, discloses such treatment, and such a chain of circumstances, that the court below found that he was justified in leaving the ship. This, we think, is correct. The evidence shows that the majority of the crew were inexperienced seamen, whose services were accepted because of the inability of the master to secure men of experience. It further appears that, shortly after his departure from the port of San Francisco, the master of the Retriever stated to one of the experienced seamen, in effect, that he intended to discharge the new men at the port of destination, and "ship some sailors on the return voyage." And, shortly before reaching Port Hadlock, the master ordered the appellant and others to "leave the moment the anchor drops." It would appear that this intention of the master was carried into effect, as the shipping articles show that four new seamen were secured for the return voyage, and that the only members of the original crew retained were the two Baker brothers, who were acknowledged to be the only experienced seamen on the ship when it left San Francisco. These circumstances, in connection with the acts of the master and mate when the ship reached Port Hadlock, warranted the appellant in considering himself discharged. Upon making demand of the master at the time for the wages due him, he was not paid anything, nor has he been paid up to this time. The master did not tell him to remain on the ship and fulfill his contract, and that he would then receive the wages agreed upon, but said, according to the appellant's testimony: "You have got your pay. You had your board,"—clearly indicating a desire on the part of the master to consider the transaction closed. This testimony was uncontradicted by the appellee, and is, therefore, conclusive upon the matters to which it relates.

The court below, after concluding that the libelant was justified in leaving the ship, stated that the cause of action set forth in the libel was for a tort in the nature of false imprisonment, and not upon the contract established by the evidence, and that this variance between the case proven and the cause of action set up in the libel is fatal to the appellant. Under the strict rules of procedure of the common law, and the civil law, the doctrine of secundum allegata et probata is conclusive, and upholds the arbitrary rule of proceeding as paramount to all other considerations. But the practice of the admiralty courts of the United States permits of more flexibility of procedure. And, in the endeavor to determine the case submitted to it upon equitable principles, the court will sometimes disregard mere technical rules and forms, and look only to the rules of natural justice. In this endeavor, the court uses its reason and discretion as a means of defeating chicanery, rectifying mis-

takes, supplying deficiencies, and even suggesting to the party the means of reconstructing his case, if necessary, without the loss of such real progress as he may have already made. The rule is well stated by Benedict, in his work on the Jurisdiction and Practice of the American Admiralty, in the following comprehensive language:

"It has always been the practice of the American admiralty courts to allow every facility to the parties to place fully before the court their whole case. and to enable the court to administer substantial justice between the parties without circuity of action, or turning round in court, and never to allow a party to overcome his adversary by the man traps and spring guns of covert chicanery, or by the surprises and technicalities of mere pleadings or practice. Therefore, on proper cause shown, omissions and deficiencies in pleadings may be supplied, and errors and mistakes in practice, in matters of substance, as well as of form, may be corrected at any stage of the proceedings, for the furtherance of justice." Ben. Adm. (3d Ed.) § 483.

This practice is confirmed by the United States supreme court in the case of The Gazelle, 128 U. S. 474, 487, 9 Sup. Ct. 142, 32 L. Ed. 500, where the court uses the following language:

"In the courts of admiralty of the United States, although the proofs of each party must substantially correspond to his allegations, so far as to prevent surprise, yet there are no technical rules of variance, or of departure in pleading, as at common law; and if a libelant propounds with distinctness the substantive facts upon which he relies, and prays, either, specially or generally, for appropriate relief (even if there is some inaccuracy in his statement of subordinate facts, or of the legal effect of the facts propounded), the court may award any relief which the law applicable to the case warrants. Dupont De Nemours v. Vance, 19 How. 162, 15 L. Ed. 584; The Syracuse, 12 Wall. 167, 20 L. Ed. 382; Dexter v. Munroe, 2 Spr. 29, Fed. Cas. No. 3,863; The Cambridge, 2 Low. 21, Fed. Cas. No. 2,334."

In the case of Express Co. v. Platten, 36 C. C. A. 46, 93 Fed. 936, the circuit court of appeals for the Fifth circuit sanctioned an amendment of the declaration after the conclusion of the plaintiff's evidence to make it conform to the proof, holding that the variance was not a fatal one, as there was no intimation that the defendant had been misled in maintaining its defense upon the merits by this variance, or that it was prejudiced thereby in any respect. In the case at bar no assertion is made that the appellee was misled by the character of case made by the appellant. Nor could the appellee well make any claim to being surprised. The substantial controversy in this case is as to whether the appellant is entitled to recover from the appellee. This is clearly indicated in the libel, even though the libel asks for damages sustained for forced detention under false pretenses, while the proofs only show that the appellant is entitled to compensation for services under contract. The court below, in its opinion, states, in effect, that the appellant has a meritorious case upon the facts proven, but denies his right to recover because of the character of his pleading. This is a technical defect merely, and under the authorities above cited the court should not allow mere technicalities to overthrow the principles of equity, and defeat the ends of justice. It is assigned as error that after the court had rendered its opinion the appellant moved the court to be permitted to amend his libel to conform to the findings

of the court. This motion does not appear in the record, but the opinion of the court is peremptory in its conclusion that the libel will "have to be dismissed, as there is a fatal variance between the case proven and the cause of action alleged in the libel"; and the decree, following the language of the opinion, peremptorily dismisses the libel. The libel being in personam, and the facts proven tending to establish a cause of action which might be prosecuted in personam, there does not appear to be any good reason why the libelant should not be permitted to amend his libel to conform to the facts of the case. Upon the subject of amendment, Benedict further says, in section 483:

"Where merits clearly appear on the record, it is the settled practice in admiralty not to dismiss the libel, but to allow the party to assert his rights in a new allegation. * * * Amendments may be made on application to the court at any time, as well after as before decree; and at any time before the final decree new counts or articles may be added, and new and supplemental allegations may be filed; and this may be done after the cause is in the appellate court, if the new allegations be confined to the original subject of controversy."

In Richmond v. Copper Co., 2 Low. 315, 20 Fed. Cas. 738, the court, speaking of the power of courts of admiralty to allow amendments of pleading, said:

"So far have they carried the power to allow amendments that it has been laid down by the highest authority that an action can never fail for want of proper allegations if merits clearly appear on the record. And several cases have been sent back from the supreme court with orders to permit amendments and then proceed to a decree. I am not speaking of amendments to introduce new facts, but those of either form or substance to conform to evidence."

The Adeline, 9 Cranch, 244, 3 L. Ed. 719; The Caroline, 7 Cranch, 496, 3 L. Ed. 417; The Anne, 7 Cranch, 570, 3 L. Ed. 442; The Edward, 1 Wheat. 261, 4 L. Ed. 86; Newell v. Norton, 3 Wall. 257, 18 L. Ed. 271.

In Wiggins Ferry Co. v. Ohio & M. Ry. Co., 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055, the circuit court, in a suit for the foreclosure of a mortgage upon the property of a railway company, had dismissed an intervening petition claiming compensation for the use and occupation by the company for a number of years of certain lands owned by the petitioner. It appears that the original occupation and use of the premises was by the predecessor of the railway company under a contract with the petitioner, and that the railway company was not the formal assignee of its predecessor under the contract. It appears further that by reason of certain actions in the state court between the petitioner and the railway company the former, under a misapprehension as to its rights, deemed itself prevented from claiming under the contract as against the railway company. The intervention was accordingly prosecuted for rent for use and occupation. The supreme court was, however, of the opinion that in a court of equity the railway company would be considered as having adopted the contract between its predecessor and the petitioner, and had made the contract its own. Under this doctrine the petitioner was entitled

to recover damages for a breach of the contract, but not upon the claim for rent for use and occupation of the premises. In commenting upon this aspect of the case, the court said:

"The most serious obstacle in the way of doing substantial justice in this case arises from the attitude assumed by the petitioner throughout the entire proceedings in the circuit court, that it was entitled to recover the rental value of the premises in question."

.After referring to the facts in the case, the court says further:

"In view of these facts, and of the persistency with which it [the petitioner] has pressed its claim for rent, and repudiated its right to recover under the contract, it would have no just cause of complaint if this court refused to permit a change of front, and affirmed the decree of the court below. Did this disposition of the case involve anything less than a total and final denial of any right whatever to compensation for the use of this property, it might be proper to do this. There is much to be said, however, in favor of the equity of petitioner's claim to an equivalent for the benefit the defendants have received from the use of this property, and we do not consider it beyond the power of this court, upon broad principles of justice, to refer this cause back for such further proceedings as are permitted by the rules and practice of courts of equity."

The court then refers to a number of cases authorizing such a practice, and concludes with this statement of the rule applicable to the facts of that case:

"A mistaken view of one's rights or remedies should not be permitted wholly to defeat a claim founded upon principles of equity and justice, and, if the pleadings can be so amended as to admit proof of such claim, and such amendment does not introduce a new cause of action, though it may set up a new measure of damages, or work a real hardship to the party defendant, it is within the discretion even of the appellate court to permit such amendment to be made."

We are of the opinion that under the authority of these cases the appellant should have an opportunity to amend his libel to conform to the facts as established by the evidence, and upon such facts a judgment should be entered by the district court. The judgment of the district court is therefore reversed, and the cause remanded for further proceedings in accordance with this opinion.