CONSTANTINE & PICKERING S. S. CO. v. WEST INDIA S. S. CO. et al.

(District Court, S. D. New York. July 14, 1914.)

1. SHIPPING ⬤�415⟿58(3)—TIME CHARTER—DELAY IN REDELIVERY—DAMAGES.
   Where there is delay in redelivery of a ship after the expiration of a time charter in assessing damages, the owner is entitled to the best going rate from the place of delivery. That rate, however, is not necessarily the highest that could have been obtained for an outbound cargo; but, as affecting such rate, it is proper to take into consideration the position in which the ship would be left at the end of the outward voyage with respect to securing another cargo.

   [Ed. Note.—For other cases, see Shipping, Dec. Dig. ⬤⟿58(3).]

2. SHIPPING ⬤⟿58(3)—INJURY TO VESSEL BY CHARTERER—DAMAGES.
   Findings of a commissioner as to damages recoverable by the owner of a vessel for injury by grounding, due to the fault of a charterer, reviewed.

   [Ed. Note.—For other cases, see Shipping, Dec. Dig. ⬤⟿58(3).]

In Admiralty. Suit by the Constantine & Pickering Steamship Company, owner of the steamship Kingswood, against the West India Steamship Company for breach of charter, impleaded with the S. W. Bonsall Timber Properties. On exceptions to commissioner's report awarding damages. Exceptions overruled.

For prior decision, see 199 Fed. 964.

The steamship Kingswood was chartered from her owners, Constantine & Pickering Steamship Company, by the West India Steamship Company at the rate of £650 per calendar month. The charter provided for redelivery at a United States Atlantic or Gulf port. The term of hire ended at 7 p. m. on April 10, 1912, and the vessel was not redelivered to the owners in a United States port until 3 p. m. on May 9th following. She was used by the West India Steamship Company during this overlap period of 28 days and 20 hours in the West India trade, in which trade she had been employed by the charterer. The market rate for steamers had risen since the charter was made, and the market rate for the Kingswood during these 28 days and 20 hours, if employed in the West India trade with redelivery in a United States, Atlantic or Gulf port, was £875 per month. If the steamship were employed on a voyage from a United States port to an English port the charter party rate was £1,175 per month. The reason for this difference was that substantially the entire profit in a trip to Europe lay in the voyage eastward; the testimony being undisputed that vessels were frequently brought back from

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Europe in ballast. Consequently a rate to Europe was exacted sufficiently large to cover the expense of bringing the vessel back in ballast.

John M. Woolsey, of New York City, for libelant.

Clarence Bishop Smith, of New York City, for respondent West India S. S. Co.

LEARNED HAND, District Judge (after stating the facts as above. [1] Upon the damages for delay the point is this: Where there is delay in the surrender of the ship at the end of a time charter, or an "overlap," so-called, whether in assessing damages the best going rates of hire may be taken at the place of delivery without regard to the position in which the ship would have left at the termination of the fixture. Freights were very high, going eastward, at the time of delivery required in the charter, owing to an English coal strike; but they were low coming west. The commissioner declined to give as damages the high eastward hire, without considering the position of the ship when she arrived in England, but thought that the low rates upon a return more than offset the advantage, even on the libelant's figures of the profitable voyage eastward. He consequently concluded that the best offerings available at the time fixed for delivery were in the West India trade, and he assessed damages on that basis.

Two points arise: Is the principle right? Was its application correct? Damages, are, of course, meant to make whole the party injured. The effort here should be to produce, so far as money can, the same result as though the Kingswood had been delivered at 7 p. m. on April 10, 1912, instead of May 9th, at any United States Atlantic, or Gulf port, excluding Key West. The owners could in that case have employed her upon several kinds of ventures, European and West Indian, and it is fair to allow them the most profitable. Damages based upon any particular employment, however, presuppose that it is reasonably certain which of all possible employments would have been chosen. Hence it involves a consideration of the motives which would have operated at that time and place to determine the choice between open possibilities. It is, therefore, not only proper, but inevitably necessary, that the negative considerations should be regarded as well as the positive. If the owners were seeking for the most profitable employment, it is, of course, at once apparent that their choice would have been influenced by the position of the ship when the first voyage was completed. It was asked: How far may this inquiry go? The answer is that the court, in deciding what would have been the owner's choice between offerings, must extend its view just so far as, and no further than, the owners might be reasonably expected to forecast the future.

The principle being correct, it remains to apply it. Upon the libelant's own figures the profit upon an eastward voyage was £29.9.5 per diem. The time rate in the United Kingdom was 4/6 on a dead weight basis, which made a net profit of £8.14.9 per diem. On a calculation (Exhibit JJ) of a voyage from Norfolk to London River and thence on time charter to a South American port, the total being 86 days, Cox, the respondent's witness, puts the net at £1,496.9.5, a little less than if she had been employed in the West India trade for the same

time on the basis allowed by the commissioner and at going rates. The libelant also mentions fixtures for rate charters out of the United Kingdom, some to South American ports, ranging from 8/3 to 15/9; but these mean nothing, without some calculation of the time which they would take, and offer no basis for comparison. Indeed, if Cox is to be believed, it was cheaper in January, 1913, to bring over a ship in ballast than to accept any of the rate charters offering at the time for South American ports, though these were in every case higher than the offerings in May, 1912 (Exhibit FF). Thus I may safely lay out of consideration the rate charter offerings altogether, upon the uncontradicted testimony. Yet it is not necessary to prove that the ship must have come back in ballast, notwithstanding the rate charters. The point is that the libelant did not show that the coal voyage would have been more profitable from the owner's standpoint than the West India trade. As we have no basis of comparison but the 4/6 time charter in dead weight, and as that results to the slight advantage of the commissioner's basis, I can see no reason to suppose that he was mistaken. The owner's actual decision to accept a coal charter is, of course, not conclusive.

I do not understand that the finding of the commissioner as to the probable earnings in the West India trade are questioned. This matter I have therefore not considered. The exceptions are overruled.

### Grounding Damages.

[2] On the other hand, it seems to me that in the matter of the grounding damages the commissioner has placed upon the libelant a burden of proof rather too severe. The testimony is uncontradicted, which was, to be sure, to be expected, and it has been already found that the ship took the ground for 24 hours from the evening of November 7th. During a part anyway of this time it was blowing heavily, and there is some testimony that the ship rocked as she lay. The officers all found her injured in the bilge tanks when she got off. The two surveyors who examined her four months later corroborated their conclusions. Each thought the bilge keel and fore foot damage was caused by grounding, and I agree with them. I find it very hard to see how any ice to be found in the Hudson river could damage the fore foot and bilge keel of such a vessel, eight feet under water. As there is no such ice, one must assume that she rode it down under her as she forced her way through. There are Newfoundland boats built to ride upon ice this way, like Great South Bay "scooters"; but the lines of an ordinary vessel would not, I should suppose, permit it. In any case, the uncontradicted testimony of disinterested experts ought not, I think, to be disregarded, even though Murray was not so positive as he might have been upon his cross-examination.

The rudder damages are most perplexing. The officers seemed to think that the damages came from the bending of the pintles while she was aground. The surveyors' theory was that sand had got in, which had cut and worn the bushings, which made a tight journal or bearing for the pintles. This was the reason for the repairs. The testimony is very uncertain as to whether any sand actually did get in; apparently

nearly anything might get in, and it would seem pretty obvious that mere friction must in time wear down the bushings. There is no evidence that any sand actually did get in, and, as I have said, the officers' theory contradicts that source of injury. I remain, after going over the testimony twice, in some doubt as to the cause of the rudder damage. I think, as the commissioner saw the surveyors and may have been controlled in part by their apppearance, that I should not disturb his findings upon that item.

The next item is for hauling the shaft and one day's dry-docking, at eight cents. The shaft hauling may have been for examination of the grounding damage, but when hauled a new tail shaft was put in, and I cannot think it is fair to give the ship the benefit of that outlay when it went to the renewal of a worn-out part. The total expense would have been about $378, but it was reduced to $325. The hauling represents, as I figure it, about $195, leaving $130 for dry-docking. On this the grounding repairs as I have found them may fairly carry $40. The commissioner's findings appear fair enough for the other items, making $452 in all, together with the overlay charges. As I have not allowed for the rudder repairs, it may change the time which should be allowed. Presumably the repairs to the rudder went on with those to the bottom, and, if so, no deduction should be made, and the allowance will be $665.18; but the time taken for the bottom repairs will control, and the item must be left open pro tanto for agreement. Interest will be allowed on the total allowance, when fixed, from the date of payment.