**SOCIEDAD ARMADORA ARISTO-MENIS PANAMA, S.A.**

v.

**5,020 LONG TONS OF RAW SUGAR et al.**

No. 163 of 1950.

United States District Court
E. D. Pennsylvania.

July 29, 1954.

Rawle & Henderson, Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, Philadelphia, Pa., for respondents.

GRIM, District Judge.

On February 1, 1950, libellant, Sociedad Armadora Aristomenis Panama, S. A., entered into a written contract with the respondent, Isbrandtsen Company, Inc.,[1] whereby the libellant agreed to transport on its ship, The Aristopais, for respondent certain bags of raw sugar, shipped by respondent, from the Philippine Islands to the United States. Pursuant to the terms of the contract The Aristopais arrived at the port of Iliolo in the Philippines to load the sugar. Since there was no available wharf at Iliolo, the vessel anchored off shore and the bags of sugar were brought out and loaded on it by lighters.

Libellant has sued for $24,480.59, the balance allegedly due it from respondent on account of unpaid freight and other charges. Respondent's answer admits owing $13,035.35.[2] Therefore, the balance in dispute, which has been withheld by respondent, amounts to $11,445.24 and consists of the following claims by libellant and set-offs alleged by respondent:

(1) Libellant's claim for additional freight based upon the gross outturn weight of the cargo instead of the net outturn weight, amounting to $388.84.

(2) Libellant's claim for demurrage at Iliolo, the loading port, in the amount of $190.97.

(3) Libellant's claim for excess wharfage at Philadelphia, in the amount of $900.

1. The libel also includes an *in rem* action against 5,020 long tons of sugar.

2. Respondent did not pay the $13,035.35, admitted by it on June 30, 1950, to be due libellant, until August 15, 1952, at which time the parties agreed that such partial payment was received subject to libellant's right to claim interest thereon for the period from June 30, 1950, to August 15, 1952, amounting to $1,694.-55.

(4) Respondent's set-off for a charge on the sugar of $1 per ton, levied by the Philippine Government, in the sum of $5,113.35.

(5) Respondent's set-off for dispatch at Iliolo, in the amount of $3,241.63.

(6) Respondent's set-off on account of alleged short delivery of 95 bags, in the sum of $756.14.

(7) Respondent's set-off on account of damaged cargo and extra stevedoring charges in connection therewith, in the sum of $854.31.

■ The principal question in the case is whether a charge on the sugar of $5,113.35 levied and collected by the Philippine Government was a charge for wharfage, in which event libellant-shipowner would be responsible for its payment,[3] or an export tax, in which event respondent-shipper would be responsible for its payment.

An Act of the United States Congress known as the Philippine Tariff Act of 1909,[4] was reenacted by the Congress of the Philippine Islands on July 4, 1946, and has been continuously in force up to the present time. Among other things it provides:

"Sec. 14. That there shall be levied and collected upon all articles, goods, wares or merchandise * * * the products of the Philippines, exported through ports of entry of the Philippines or shipped therefrom to the United States or any of its possessions, a duty of one dollar per gross ton of one thousand kilos as a charge for wharfage, irrespective of the port of destination or nationality of the exporting vessel."

In accordance with the requirements of the statute and in order to get permission to export the sugar from the Philip-pines, respondent paid $5,113.35 to the Government of the Philippines. Respondent deducted this sum from the amount of money it owed libellant for freight on the theory that the charge levied under the statute was a charge for wharfage, which, according to the contract,[5] libellant-shipowner was obligated to pay. Libellant is suing for this sum, contending that this charge was not a wharfage charge but rather an export tax on the sugar which respondent, the shipper of the sugar, is responsible to pay, since there is nothing in the contract to impose an obligation on the libellant-shipowner to pay a tax on the sugar.

The statute under which the charge was levied is somewhat ambiguous in that it refers to both a duty and a wharfage charge, saying "there shall be levied * * * a duty * * * as a charge for wharfage * * *." However, the meaning and purpose of the statute become clear when its legislative history is considered. The report of the House Ways and Means Committee[6] states in explanation of the statutory section in question:

"This enactment becomes necessary because of section 5 of the House bill (H.R. 1438) * * * which passed the House April 9 last and is now pending in the Senate. This section provides for free trade between the United States and the Philippine Islands. * * * The most important reason for this legislation grows out of the fact that the insular government, under the last named act, will be deprived of about $1,000,000 in revenue because of the free trade relations we establish between the United States and the Philippine Islands under said section. * * *

---

3. The contract provides: "wharfage charges at both ends for owner's account." In the shipping trade this meant that if the ship used a wharf for the purpose of loading or discharging the sugar the amount charged by the owner of the wharf for its use would be paid by the libellant-shipowner.

4. Act of August 5, 1909, 36 Stat. 84, as amended.

5. See footnote 3, supra.

6. H.R.Rep.No.7, 61st Cong. 1st Sess., Page 1–2 (1909).

"One feature of the present tariff law for the Philippine Islands is the imposition of export duties. * * * These export duties are reenacted in this bill. * * * Of course an export duty is foreign to the policy of our Government and prohibited by our Constitution. But it has always been a feature of the revenue laws in the Philippine Islands, and was under Spanish occupation. It is well justified in the present bill because of these conditions in the islands. Several years ago a tax upon land was imposed by the insular government. When the time drew near for its enforcement, it appeared that no real estate produced sufficient revenue to bear the burden of such a tax except that which was used for the production of hemp, sugar, tobacco and copra.

"On the other real estate, and especially upon the small holdings of individuals, such a tax if enforced would result in the sale of the land and in widespread distress throughout the islands. For this reason the insular government has suspended the operation of this land tax ever since it was enacted, and no collections have been made under it. The most that can be said against this small export tax is that it is a tax upon land, and this is possibly true in the last analysis, although a part, or perhaps all, is paid by the consumer of the products raised. It is a tax upon the products of the soil, the usufruct of the land, and therefore upon the land itself. No claim is made but that the holders of lands used in the production of the crops above mentioned are well able to pay the small tax if it comes out of the price of their products. Hence it is no burden upon the holders of these lands but such as they ought to bear."

This legislative history clearly demonstrates that Congress in enacting Section 14 of The Philippine Tariff Act of 1909 intended that the charge imposed upon exports from the Philippine Islands was to be a duty or tax and not merely a charge for the use of wharves.

Furthermore, an analysis of the statute itself indicates that it imposes a tax and not a charge for wharfage. It should be noted that the charge is levied only on certain products, while certain others are exempted. There is no charge levied upon goods imported into the Philippines. The charge is imposed (as in the present case) regardless of whether a wharf is used in the loading of a ship and, if a wharf is used, regardless of whether the wharf is owned by the government or by a private owner.

In Philippine Sugar Control Agency v. Collector of Customs, 1927, 51 Phil. 131, an exporter of a cargo of sugar brought suit to recover a charge levied under the Act involved in the instant case upon the ground that the Act imposed a charge for wharfage and that the levy and collection of the charge under the Act were invalid because his sugar had been loaded from his own wharf and not from a Government wharf. The Supreme Court of the Philippine Islands, in denying recovery, sustained the validity of the charge on the ground that it was a tax and not a fee for the use of a wharf, pointing out 51 Phil. at page 142:

"* * * The wharfage tax in question has been continuously levied and collected from 1901 up to the present time. That is to say in 1901 the Philippine Commission, which enacted the law, knew or must have known that there was not a single pier or wharf in the Philippine Islands, and yet without such wharves or piers the Government has at all times levied and collected the tax in question."

■ Accordingly, it is abundantly clear that the sum of $5,113.35 paid by the respondent-shipper to the Philippine Government was an export tax on the sugar, which respondent was obligated to pay, and not a wharfage charge. Therefore, libellant is entitled to recover from respondent this sum which was improp-

erly deducted by respondent from its freight obligation under the contract.

 There being insufficient evidence in the record to support libellant's claim for $388.84 for additional freight, its claim for $190.97 for demurrage at Iliolo, and its claim for $900 for excess wharfage at Philadelphia, these three claims will be disallowed.

Respondent's alleged set-offs of $3,241.63 for dispatch at Iliolo and $756.-14 on account of alleged short delivery of 95 bags of sugar also will be disallowed for failure of proof.

The evidence in reference to each of these disallowed claims and set-offs is so meagre and uncertain and so obviously inadequate that the Court is unable to make findings of fact pertaining to them.

Respondent's alleged set-off on account of damaged cargo and extra stevedoring charges in connection therewith, totalling $854.31, also will be disallowed. During the voyage in question fresh water leaked from a valve flange on the end of a steam smothering line in the No. 5 lower hold, causing damage to about 276 bags of sugar. Immediately prior to loading the sugar the vessel had discharged flour which was undamaged from that same compartment. Before the sugar was loaded the pipe and valve in question were inspected by the Master and the Chief Mate of the vessel and found in good condition and free from leakage. Two hours before the hold was fully loaded the Master again inspected the pipe and valve and found no evidence of leakage. Under the circumstances, the visual inspection of the valve flange, which began to leak during the voyage, constituted due care on the part of the libellant in making that particular part of the ship seaworthy at the inception of the voyage.

As stated above,[7] respondent admitted on June 30, 1950, that, of the $24,480.59 claimed by libellant, it owed $13,035.35. As of June 30, 1950, this portion of libellant's claim was a liqui-

dated sum upon which interest ran until August 15, 1952, the date on which respondent paid the $13,035.35, subject to libellant's right to claim interest thereon. In view of these facts, I hold that libellant is entitled to recover interest at 6% on the sum of $13,035.35 for the period from June 30, 1950 to August 15, 1952, or $1,694.55.

To summarize, libellant is entitled to recover from respondent $11,659.98, which is the total amount of the items improperly deducted by respondent in its payment under the freight contract in question, plus the interest on the liquidated portion of libellant's claim.

The statements of fact and law in the foregoing opinion will constitute the Court's findings of fact and conclusions of law in the case.

Judgment may be entered in favor of libellant and against respondent in the amount of $11,659.98.