LIBERTY NAVIGATION & TRADING
CO., Inc., Plaintiff,

v.

KINOSHITA & CO., LTD., TOKYO,
Defendant.

United States District Court
S. D. New York.
Dec. 2, 1959.

Webster, Sheffield & Chrystie, New York City, for plaintiff, John V. Lindsay, Donald J. Cohn, New York City, of counsel.

Hill, Betts & Nash, New York City, for defendant, James E. Freehill, Melvin J. Koch, New York City, of counsel.

DAWSON, District Judge.

This action, tried by the Court without a jury, is one to recover damages for breach of a charter party. The defendant admitted that it breached the charter party. The only issue to be resolved by the Court is the measure of damages to be awarded to a shipowner for a total failure of performance by the charterer.

The Court finds the following facts:

Plaintiff, Liberty Navigation & Trading Co., Inc., is the owner and operator of the American Flag steamship Josephina. On or about May 17, 1957, plaintiff entered into a charter party with the defendant, Kinoshita & Co., Ltd., by which defendant chartered the SS Josephina to transport sugar from the Philippines to Korea. The charter party provided for the carriage of 10,160 metric tons of sugar in bags, 5% more or less at plaintiff's option, at the rate of $12 per long ton, the vessel to arrive in the Philippines on or before July 10, 1957.

On June 10, 1957, defendant by cable cancelled the contract. Plaintiff thereupon, after unsuccessfully urging that defendant carry out the charter party, considered the contract breached and sought other employment for the ship in an effort to mitigate its damages. The plaintiff made reasonable efforts to mitigate its damages but was successful only in securing another charter which resulted in a loss. The substitute charter did not succeed in mitigating the damages at all.

The SS Josephina, if it had carried out the charter party with defendant, would have carried a minimum of 10,145 long tons of sugar on the voyage, a cargo which was within the plaintiff's option under the contract to carry 10,160 metric tons, 5% more or less. At the contract rate of $12 per long ton the gross freight payable to the plaintiff under the contract would have been $121,740.

To complete the charter the SS Josephina would have sailed from Moji, Japan, to the Philippines in order to load defendant's cargo, a trip of 6.2 days. Once there completion of the charter would have required 31.3 additional days. In performing this particular voyage the

ship would have incurred the following special expenses:

| | | |
|---|---|---|
| Fuel at sea | $ 9,944 [1] | |
| Ship broker's commissions | 4,500 | |
| Port charges | 7,000 | |
| Dunnage | 1,680 | |
| Total | $23,124 | |

Because defendant cancelled the contract these expenses were not incurred by the plaintiff.

The Court finds that the damages suffered by the plaintiff is the sum of $98,616, being the difference between the gross freight which would have been received under the contract and the expenses avoided by not having to perform the charter.

## Discussion

The defendant urged at the trial that the SS Josephina could not have carried 10,145 long tons of sugar, but that the capacity of the Josephina fully loaded would have been 9,539 long tons. However, plaintiff properly contended that the figure of 9,539 long tons is exclusive of the capacity of the vessel's deep tanks and the deep tanks themselves had an additional capacity of 1,300 tons. Plaintiff introduced proof that it was common practice to use the deep tanks to ship raw sugar and that the deep tanks had been used to carry raw sugar on the substitute charter performed by the SS Josephina. The charter itself called for carriage of 10,160 metric tons of raw sugar, which was the equivalent of 9,999 long tons. The charter party itself, signed by the shipowner, was therefore some indication that the shipowner believed that the ship could carry 9,999 long tons, and in view of the capacity of the ship, some indication that the parties themselves contemplated the use of the deep tanks for the carriage of the sugar. It seems improbable that a shipowner would have entered into a charter party which contemplated the performance of a charter which the vessel would have been incapable of performing. The Court, therefore, accepts the testimony of the expert of the plaintiff that the ship could carry 10,145 long tons and would have carried such cargo if the charter had been performed.

Turning to the more basic question of the proper measure of damages to which the shipowner is entitled where the shipowner was unsuccessful in mitigating its damages, plaintiff and defendant offered widely divergent theories.

On the one hand, plaintiff asserts that it is entitled to recover in damages the value of the gross freight it would have received had the charter been performed, plus the loss which it sustained on the substitute voyage. The purpose of the substitute voyage was to attempt to mitigate damages. To the extent that the substitute voyage did succeed in mitigating damages such mitigation might reduce the damages which have been allowed. If, however, the substitute voyage turned out only to add to the losses of the shipowner, as was the case here, the additional losses cannot be added to the shipowner's damages. When a shipowner takes a substitute voyage to mitigate damages it cannot expect that the charterer would be responsible for the loss which the shipowner incurred on the substitute voyage.

Defendant, on the other hand, attempts to establish damages by deducting from the gross freight the shipowner would have received, all expenses which the shipowner had, or would have had, during the period of the voyage. It was stipulated that the operating costs of the vessel per day were $1,510. Defendant would therefore deduct from the gross freight the sum of $56,625, being $1,510 for 37.5 days. The operating costs of the vessel included such things as payroll, which had to be incurred whether the ship was performing the charter or not.

[1]. The cost of fuel for the time the ship would have been at sea, if it had made the cancelled voyage, would have been $12,312. However, had the vessel remained in port for that time it would have consumed $2,368 worth of fuel; hence the cost of fuel for performing the sea voyage on the charter would have been $9,944.

It would include ordinary overhead expenses which would have had to be incurred whether the ship performed the charter or not. If the charter had been performed, plaintiff would have received funds to enable it to meet those overhead expenses. Having not received them, and having had to pay them anyway, plaintiff is entitled to damages based on the freight it would have received less only expenses saved by not having to perform the voyage.

Defendant, under its theory, confuses "profits" with "damages." A ship may receive certain income from a voyage which may result in no actual profit to it after taking into account its operating overhead, but if it had to pay those operating overhead expenses in any event it certainly would have been damaged had it not received amounts which it would have received under the charter, which would have helped it to pay such overhead expenses. The measure of damages, in a case such as this, is the loss which the shipowner sustained, and "the loss * * * is the difference between the freights which he would have received had the goods been properly shipped, and the freights which become payable on what has in fact been shipped * * deducting * * * expenses which the shipowner avoids by not having to take on board, carry, and discharge the cargo not shipped. * * *" Carver, Carriage of Goods by Sea (10th Ed., 1957), at page 977.

The measure of damages for breach of a charter party was well defined by the United States Supreme Court in The Gazelle and Cargo, 1888, 128 U.S. 474, 9 S.Ct. 139, 142, 32 L.Ed. 496, in the following language:

> " * * * a ship-owner, who is prevented from performing a voyage by a wrongful act of the charterer, is *prima facie* entitled to the freight that he would have earned, less what it would have cost him to earn it."

In that case the charterer breached the contract by refusing to order the vessel to a safe port. The vessel was detained in port for about the same time as required by the charter party and the expenses of the vessel in port were the same as at sea. Plaintiff was therefore unable to avoid any expenses and recovered full freight plus expenses incurred from loading defendant's cargo, wharfage and towing.

The phrase, "less what it would have cost him to earn it," must refer to the particular expenses that the shipowner would have incurred in earning the freight. It does not refer to ordinary maintenance expenses but only to those expenses which he saves by the breach of the contract. See, Restatement of the Law, Contracts, Vol. 1, § 335:

> "If the defendant's breach of contract saves expense to the plaintiff by discharging his duty of rendering a performance in return or by excusing him from the performance of a condition precedent, the amount of this saving is deducted from the damages that would otherwise be recoverable."

Thus in determining damages for failure to perform the charter we deduct not the general overhead of the ship but only those expenses which the shipowner avoided by not having to take on board, carry and discharge cargo not shipped. These items, in the present case, would be the extra cost of fuel at sea over the fuel which would be consumed while the ship was idle in port, the ship broker's commissions, the port charges and the dunnage.

The error in defendant's method of computing damages is well pointed up by the fact that it seeks to take as a deduction an item for depreciation. This is properly an item of general accounting expense which is charged to the vessel whether the ship was performing the charter or not. The authorities relied upon by the defendant for deducting depreciation all involved collision cases where the value of the ship itself becomes the subject of damages. The shipowner did not avoid depreciation by not having to carry cargo and therefore it is not an

item which may be deducted in determining damages.

■ The defendant also seeks to deduct an item for a Philippine Export tax on the ground that the charter party provided that "taxes, if any, are to be for the Owner's account."

Under the terms of Section 3, Part II of The Republic Act No. 1371,[2] a wharfage charge of 2 pesos a metric ton is levied on certain exports from the Philippines, including raw sugar. Section 1(b) of the Act [3] makes it clear that the party liable for such charge is the owner, consignee or agent of the merchandise, rather than the shipper.

Clearly the defendant, as owner of the cargo, is responsible for the payment of such charges, but in this case the defendant seeks to shift liability to the plaintiff on the ground that Clause 22 of the rider attached to and made part of the charter agreement requires that "Dunnage and mats, and taxes if any, are to be for the Owner's account." [4]

In view of the unmistakable statutory language that the owner of the cargo bear this expense, and that the charter clause does not specifically require that taxes imposed on the ship's cargo are to be borne by the shipowner, it seems doubtful that the parties contemplated that such a tax strictly imposed on defendant by law and amounting to more that 8% of the gross freight was to be assumed by the shipowner. Plaintiff in-

troduced evidence that these expenses were not assumed by a shipowner generally, and since defendant offered no proof to the contrary it is the conclusion of this Court that under the circumstances the rider provision did not make plaintiff liable for the payment of these export taxes.[5]

### Conclusions

■ The Court concludes that the defendant breached the charter party with the plaintiff and is liable in damages to the plaintiff by reason thereof.

The Court concludes that the damages would consist of the gross freight the plaintiff would have earned under the cancelled charter, less any expenses avoided by not having to perform the charter.

The Court concludes that plaintiff is entitled to a judgment for damages against the defendant in the sum of $98,-616, being the difference between the gross freight which would have been received under the contract and the expenses avoided by not having to perform the charter, and the plaintiff is entitled to such sum, together with interest thereon from July 10, 1957, and the costs of this action.

This opinion shall constitute the findings of fact and conclusions of law, in accordance with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A.

Let judgment be entered accordingly.

2. Republic Act No. 1371, Philippine Laws, Vol. X, 1955.

3. "Section 1. *Definitions.*—As used in this Act:

    \*    \*    \*    \*    \*

    "(b.) Wharfage charge is the amount assessed against the cargo of a vessel engaged in the foreign trade, based on the quantity, weight or measure received and/or discharged by such vessel. The owner, consignee, or agent of either, of the merchandise is the person liable for such charge."

4. Under the terms of the general charter entered into between plaintiff and defendant, plaintiff as shipowner is designated "the Owner" and defendant as charterer is designated as "Charterer."

5. Although this tax is referred to in the statute as a wharfage charge, nevertheless there is authority to support the point of view that it is in reality an export tax. See, Sociedad Armadora Aristomenis Panama, SA v. 5,020 Long Tons of Raw Sugar, D.C.Pa.1954, 122 F.Supp. 892, affirmed 3 Cir., 1955, 223 F.2d 417.