**LIBERTY NAVIGATION & TRADING CO., Inc., Plaintiff-Appellee,**

v.

**KINOSHITA & CO., LTD., TOKYO, Defendant-Appellant.**

**No. 14, Docket 26107.**

United States Court of Appeals Second Circuit.

Argued Sept. 28, 1960.

Decided Dec. 14, 1960.

Lumbard, Chief Judge, dissented in part.

---

**3.** See Cal.Penal Code, § 337b; Iowa Stat. § 739.12 I.C.A.; Md.Code 1951, Art. 27, § 30; Purdon's Penn.Stats. Tit. 18, § 4614; Tenn.Stat. § 39–824.

John V. Lindsay (of Webster, Sheffield' & Chrystie), New York City (Donald J. Cohn, New York City, on the brief), for plaintiff-appellee.

James E. Freehill (of Hill, Betts,. Yamaoka, Freehill & Longcope), New York City (Daniel J. Tobin and Melvin J. Koch, New York City, on the brief;.

William F. Suglia, New York City, of counsel), for defendant-appellant.

Before LUMBARD, Chief Judge, and TUTTLE * and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal presents an interesting question as to the measure of damages for the breach of a voyage charter. Our view differs both from that of the trial judge and from that urged by appellant.

On May 17, 1957, Liberty Navigation & Trading Co., Inc., as owner, and Kinoshita & Co., Ltd., as charterer, entered into a charter of the American steamer Josefina. The vessel was to proceed to loading ports in the Philippines, there load a cargo of raw sugar in bags, "10,160 metric tons 5% more or less at owners option which the charterers bind themselves to ship," and then proceed to discharging ports in Korea. The freight was to be $12 per long ton. The Josefina was required to be in the first loading port in the Philippines on or before July 10, 1957. The charterer was to load at the average rate of 1,000 metric tons per weather working day and to discharge at the average rate of 1,200 metric tons per weather working day, Sundays and holidays excepted, unless used. Loading and discharge were to be performed by the charterer at its expense; however, a separate clause, 22, provided: "Dunnage and mats, and taxes, if any, to be for Owners account."

On June 10, 1957, the Philippine Government having suspended the issuance of export licenses for sugar to Korea, defendant cancelled the charter. The Josefina was then en route with a cargo from India to Japan. On June 21 plaintiff wrote that it regarded the notice of June 10 as a repudiation of the charter, would seek other employment for the Josefina, and would hold defendant liable in damages. Plaintiff did not succeed in obtaining other cargoes within the Far East. However, by paying an indemnity of $12,000 to another vessel, plaintiff arranged a charter from the Philippines to the east coast of the United States, on what were known to be relatively unfavorable terms. The substitute charter consumed 82 days, earned freight of $152,310, and resulted in an overall loss of $71,735; however, it had the advantage, among others, of returning the Josefina to the United States where she had to be in any event in October when the articles of her crew expired. Defendant does not dispute that it is liable for breach of the charter and that plaintiff took all reasonable measures to mitigate the damages.

The first step in computing the damages was to determine the freight plaintiff would have received under the cancelled charter. Here there was a dispute as to how much sugar the Josefina could have carried. The trial court found she had capacity to carry 10,145 long tons, an amount within the owner's option to take on 10,160 metric tons 5% more or less; at the agreed rate this would have yielded freight of $121,740. Appellant claims she could not have carried more than 9,539 long tons, but we accept the judge's finding since there was a conflict of testimony and his determination can in no event be deemed clearly erroneous.

A much more serious controversy concerned the amount to be deducted from the freight for the expenses plaintiff would have had in performing the cancelled charter and the consideration to be given to the results of the substitute charter. As to the former, the trial judge took the view that the only expenses properly deductible from the freight under the cancelled charter were such expenses as would have been entailed in making the voyage over and above the amounts that would have had to be expended in any event to maintain the vessel for the same length of time in a foreign port. As to the second, he held that, since the substitute charter had resulted in a loss, it was not to be considered at all. From the estimated freight of $121,740 receivable under the

* Of the Fifth Circuit, sitting by designation.

cancelled charter he therefore deducted only $23,124, this being the sum of ship broker's commissions, port charges and dunnage that would have been payable by the vessel under the cancelled charter, and the excess of the cost of fuel for the 16½ days when the Josefina would have been at sea over the fuel cost for maintaining her in port during the same period. Accordingly, he awarded damages of $98,616.

Defendant attacks the award as excessive, contending that, at least in the ordinary case, damages for the breach of a voyage charter may not be more than the excess of the freight for the voyage over the expenses of the voyage determined on a full costing basis, although they may be less than this to the extent that a substitute charter has produced profits. The plaintiff claims the award to be required by The Gazelle and Cargo, 1888, 128 U.S. 474, 9 S.Ct. 139, 32 L.Ed. 496. In our view the District Court overcompensated the plaintiff, but not to the extent the defendant argues.

■■ We see no logical basis for a rule that would set the difference between the freight and the fully allocated cost of performing the cancelled voyage as the maximum damages that could be recovered for breach of a charter where consequential damages are not established. Plaintiff points out that such a rule would provide an incentive for the breach of voyage charters when the market had fallen so that owners were offering charters at less than full costs. The damages which the law accords to the plaintiff are the value of the defendant's performance less the plaintiff's savings from being relieved of the necessity of performing on his own part. 5 Williston, Contracts (1937 ed.), pp. 3765–66. Accordingly, what must be deducted from the freight is "any saving to the plaintiff due to the non-performance of the contract." Ibid., p. 3764; amounts which the plaintiff has had to pay in any event, e. g., crew wages, during a period when the vessel is idle, have not been saved. Defendant has cited no authority to support the rule of limitation which it advances. Indeed, in one of the decisions relied on by it, United Transportation Co. v. Berwind-White Coal-Mining Co., 2 Cir., 1926, 13 F.2d 282, this Court sanctioned a measure of damages more liberal to the owner. There the cancelled charter would have been completed in 36 days, whereas the substitute charter began five days later and ran for a longer period. The commissioner computed damages as being the profit under the broken charter determined after deducting full costs, less 31 times the daily profits under the substitute charter similarly computed, plus 5 days of ordinary expenses for keeping the vessel in port while awaiting the substitute charter. This Court sustained the commissioner's computation against attack by the charterer.

■ The formula in the United Transportation case would support the award here made by the District Court if there had been no substitute charter; for, if the vessel is idle for the entire period, it is immaterial whether one first deducts from the freight the expenses of the broken charter computed on a fully allocated basis and then adds back the expenses of maintaining the vessel in port for the same period, or deducts only the added expenses as the district judge did. However, here there was a substitute charter which, although operated at an overall loss, made some contribution to such expenses as crew hire, maintenance, etc., during the period of the broken charter. The District Court was mistaken insofar as it failed to credit defendant with the amount so contributed and thereby required defendant to reimburse plaintiff for some general expenses that plaintiff has already recovered.

■ Analysis of the figures of record will serve both to demonstrate this and to arrive at a proper award, bearing in mind the caution in Venus Shipping Co. v. Wilson, 2 Cir., 1907, 152 F. 170, that in determining damages for a broken charter "approximate accuracy is all that can be reasonably expected." Before proceeding with this analysis, we must fix the duration of the cancelled charter.

The trial judge found that the cancelled voyage would have required 37½ days, although, because of his computation of expenses on an added cost basis and his belief that the substitute charter should be disregarded, this figure does not appear to have entered into his calculations. We must first consider how long the charter in fact would have taken and, if the answer is more than 37½ days, decide whether defendant is precluded by an alleged stipulation from asserting this.

■ Under the charter defendant was entitled to take approximately 10¼ weather working days to load and 8½ to unload. These 18¾ days would necessarily have included at least two Sundays on which defendant was not required to load. Addition of these brings us to a figure approximating the 21 days shown in the stipulation. However, the Josefina's log book showed there was a typhoon in the Philippines which prevented any loading of cargo from 11 a. m. on July 14 to 8 a. m. on July 16. Since the Josefina did not complete the discharge of her prior cargo in Japan until July 2 and could not have reached the Philippines before July 8, this typhoon would have occurred during her loading period. However, July 14, 1957, was a Sunday. Hence the correct figure for loading time should be 22 days and the total days to complete the voyage 38½.[1]

■ We do not think appellant is precluded from claiming this minor adjustment. The alleged stipulation was prepared at the end of the first day of the trial in response to the court's request that the parties endeavor to agree on certain facts. The transcript shows that when the trial resumed, a colloquy took place between the court and counsel which is reproduced in the margin.[2] We read this as preserving defendant's right to assert the voyage would have lasted longer than 37½ days if everything did not go well; certainly the contrary is not clear and our construction is borne out by plaintiff's lack of objection when, later in the trial, defendant called the court's attention to the entry in the log concerning the typhoon.

Making this adjustment, and also abandoning the division of the fuel costs into two categories for a special reason applicable to this case that will appear below, we come to a figure of $28,649.50 representing what plaintiff would have saved from non-performance of the charter if the Josefina had remained idle in port. The stipulation showed that the total expenses of the cancelled charter (adjusted for the extra day) amounted to $86,784.50. Hence the expenses for

1. Plaintiff urged to the contrary testimony contended to show that loading time would be 10 days including some good and some bad. In fact the testimony related to unloading. In any event, under the charter defendant had the right to take 10¼ weather working days to load; it is immaterial whether it might have been able to load in less.

2. "Mr. Cohn [for plaintiff]: Your Honor, the parties have agreed on most of the items which were in dispute on Friday. I would like to hand this up. I don't have the original.

"Mr. Freehill [for defendant]: I have agreed to stipulate these as estimated expenses they would have incurred if everything went well. In other words, they had no accidents at sea, they had no rain at the loading or discharging ports which would prevent the cargo being loaded or discharged.

"Mr. Cohn: This was not our understanding on Friday.

"The Court: Let me ask you this. This stipulation that you have shows the number of days of steaming time and you are agreeable to it?

"Mr. Freehill: That would be the estimated time if everything went well.

"The Court: Total days to complete the voyage would be 37½ days.

"Mr. Freehill: That is right. If everything went well.

"The Court: Do I take it, then, that it is agreed that the cost of completing that voyage would have been $85,131?

"Mr. Freehill: That is the estimated cost if everything went well.

"Mr. Cohn: These reservations of everything going well were not mentioned on Friday.

"The Court: All I want to know, is that the figure you are willing to take?

"Mr. Cohn: I am willing to accept it."

items that would have been incurred regardless of performance amounted to $58,135. If the substitute charter had been for exactly the same period as the cancelled charter, we could find what contribution the substitute charter made to these general or "overhead" expenses by deducting from the freight under the substitute charter expenses of the same character as the $28,649.50 and determining what was left. However, the substitute charter was for 82 days, as against the 38½ days of the cancelled charter, and the problem is to determine how much plaintiff received against the $58,135 of overhead expenses during those 38½ days.[3]

■ Some proration is clearly called for; the question is how this is to be done. Certain items of expense, such as crew wages and food, and maintenance of the vessel, accrue on a day-to-day basis; others, such as an indemnity that had to be paid to procure the charter, costs of loading and discharge, and Panama Canal dues, do not. In strict theory fuel costs should be divided between the minor costs that would be incurred in keeping the vessel in port, which should be prorated, and the excess costs entailed in having her at sea, as Judge Dawson did in the case of the cancelled charter. However, the record does not afford all the data required to make such a separation for the substitute charter; since the difference in result must be small, we will include all fuel costs with items of the sort just described. We think these items, amounting to $110,874, which are of the same general nature as those comprising the $28,649.50 of out-of-pocket savings deducted from the freight of the cancelled charter, should be deducted *in solido* from the freight of $152,310 under the substitute charter, that the balance of $41,436 should be prorated over the 82 days of the substitute charter, and that the quotient, $505.32, should be multiplied by 38½, resulting in a figure of $19,454.82 as earnings of the substitute charter applicable to the overhead expenses of 38½ days and thus in further reduction of plaintiff's damages. Adding this $19,454.82 to the $28,649.50 figure of out-of-pocket savings already determined, and deducting the sum, $48,104.32, from the estimated freight of $121,740, we arrive at a figure of $73,635.68 of damages. This compares with the award of $98,616 made by the District Court.[4]

■ It might be argued by plaintiff that, since the substitute charter had to be performed as a whole, it is entitled to have the freight applied to the full payment not only of the non-proratable expenses but also of the proratable expenses for the last 43½ days, before any credit is given for the amounts earned against such expenses during the first 38½ days. On the other hand, it is argued that all expenses should be prorated, a method which, in most cases including this one, would result in a smaller recovery. No rules in this field are "capable of exact and perfect application." 5 Corbin, Contracts (1951 ed.), § 992. We think the method here adopted provides the fairest measure of the contribution made by the substituted charter to the overhead expenses the owner would have had during the corresponding period of the cancelled charter, and that this, along with the out-of-pocket expenses that were eliminated, was the "saving to the plaintiff due to the non-performance of the contract." Defendant claims it is entitled to a credit larger than we have allowed because of the contribution made by the

3. In fact, the Josefina did not reach Manila to load under the substitute charter until July 12. However, this delay appears to have been caused not by requirements of the substitute charter but by the vessel's having remained in Japan for her own convenience. We shall therefore treat the substitute charter as if it had begun on the same date, July 10, that the cancelled charter was to have commenced.

4. Defendant's claim that depreciation should be computed as an expense of the cancelled charter need not be considered; for if it were so included, the same item would have to be included as an expense of the substitute charter and the two entries would wash.

substitute charter in getting the Josefina to the United States, a voyage which she might have been obliged to make in ballast had the cancelled charter been performed. We do not hold there are no circumstances in which a more favorable position of the vessel created by a substitute charter may be taken into account, cf. Constantine & Pickering S. S. Co. v. West India S. S. Co., D.C.S.D. N.Y.1914, 231 F. 472; Poor, Charter Parties, 4th ed., p. 240; but in order to sustain this argument defendant was obliged to show that no cargo for the United States would have become available in late August when the cancelled charter would have been completed, and this burden it did not discharge. *Per contra,* if plaintiff had claimed the entire loss on the substitute charter as consequential damages, see 5 Williston, Contracts (1937 ed.), § 1354, it would have had the burden of showing it could have obtained such cargo. However, no such claim was advanced. It is plain that if we look only at the period during which the two charters overlapped, the substitute charter made some contribution to the expenses of maintaining the vessel and thereby reduced rather than increased plaintiff's loss. There is thus no occasion to consider here the circumstances under which an owner may recover more than the charterer's performance and the rule in Hadley v. Baxendale, 9 Exch. 341 (1854).

There remains defendant's claim that, under clause 22 of the charter, "Dunnage and mats, and taxes, if any, to be for Owners account," deduction from the profit of the charter should be made for a "wharfage charge" of 2 pesos a metric ton imposed on the owner of certain exports from the Philippines, including raw sugar, under Section 3, Part II, of Republic Act No. 1371. It has been held that this levy, which goes back to 1909, although denominated a wharfage charge, in reality is an excise tax, Sociedad Armadora A. P. v. 5,020 Long Tons of Raw Sugar, D.C.E.D.Pa.1954, 122 F.Supp. 892, 894, affirmed 3 Cir., 1955, 223 F.2d 417. While that consideration was decisive in the case cited, where the ship's liability was for "wharfage charges at both ends," it is not so here since the clause imposing liability on the ship refers to "taxes." Nonetheless we think the reference in the charter was to items such as port charges and loading fees imposed on the vessel and not to export taxes on the goods which, as the District Court pointed out, 178 F.Supp. 733, amounted to 8% of the gross freight. The charter was for a particular voyage from the Philippines and between parties evidently familiar with Philippine law; a reference to "taxes, if any" in a clause dealing also with dunnage and mats, was hardly apt language to impose liability on the owner of the vessel for a levy on the charterer's goods, of this nature and amount.

The judgment is modified to award plaintiff $73,635.50, with interest from July 10, 1957, and plaintiff's costs in the District Court, and as so modified is affirmed. Defendant shall recover half the costs of its appeal in this Court.

LUMBARD, Chief Judge (concurring in part and dissenting in part).

I am in full agreement with all of Judge FRIENDLY'S opinion for the majority except for that section which recomputes the damages to be assessed against the defendants. I would determine the damages by adding to the anticipated profits ($34,955.50) the actual loss incurred during the first 38½ days of the substitute charter ($33,680.19), allowing damages in the total amount of $68,635.69. Thus, I differ from the opinion of the majority in two respects.

### I.

The majority assumes that the recoverable damages are to be measured entirely by the freight which would have been paid on the cancelled charter. It proceeds to compute the "saving" attributable to the breach by adding together (1) the amount which the plaintiff would have spent on the cancelled charter in excess of his cost of remaining idle in port and (2) the substitute charter's

contribution towards the amount which would have been spent had the plaintiff stayed in port for the 38½ days of the cancelled charter. The latter figure is computed by first subtracting all the expenses in excess of in-port costs from the total freight of the substitute charter and then multiplying the remainder by the ratio that the time to be consumed by the cancelled charter bore to the time taken by the substitute. This sum is then subtracted from the freight that was due on the cancelled charter, and the remainder is awarded as damages.

However, the black-letter rule on contract damages, agreed upon by all authorities, is that they should be so measured as to put the plaintiff where he would have been had the contract been performed. See McCormick, Damages § 137 (1935); 5 Corbin, Contracts § 992 (1951). What should be awarded to the plaintiff is the value of performance, or, in other words, the anticipated benefit plus the negative or "reliance" interest. See 5 Williston, Contracts § 1339 (1937); Fuller & Perdue, The Reliance Interest in Contract Damages, 46 Yale L.J. 52, 373 (1936). The Restatement of Contracts § 329 says: "Where a right of action for breach exists, compensatory damages will be given for the net amount of *the losses caused and gains prevented* by the defendant's breach, in excess of savings made possible. * * *" (Emphasis added.)

Hadley v. Baxendale, 9 Exch. 341 (1854), of course puts a ceiling on the recovery of losses. But if they were reasonably foreseeable at the time of contracting, then the plaintiff is entitled to have "not only assessment of gains prevented by the breach *but also of losses ensuing* which would not have occurred had the contract been performed." 5

Williston, Contracts p. 3764 (1937). (Emphasis added.) Had the defendant in this case been told by the plaintiff at the time they entered into the contract, with necessary detail, that a profitable charter awaited the plaintiff in Korea, the defendant could not have avoided liability for the loss of that profit if the breach prevented the plaintiff from reaching Korea.

If, as the majority suggests, damages are determined by matching the receipts of the substitute charter against the anticipated expenses of the cancelled one, damages could not exceed the original freight even if they were foreseeable. Moreover, even if such special foreseeable damages were included in the majority's formula as special expenses of the substitute charter, they would be only partially restored once the computation was complete.[1]

The gain that was prevented by the breach was the anticipated net profit—the difference between the freight and the full stipulated cost of performing the cancelled charter. This amount, $34,955.59, is clearly recoverable in full under any computation of damages. What I would add to the anticipated profit is the loss incurred as a result of the breach.

In fact, the planned voyage was never made. Thus, the hypothetical allocation of expenses between those which would have been sustained in port and those attributable to travel is not only confusing and uncertain but also totally irrelevant. In addition to the lost profit, the breach caused an out-of-pocket loss insofar as it made necessary a loss charter; the substitute here was found to be reasonable by the district court. Since it was foreseeable that the cost of operating the ship would force the plaintiff to undertake a substitute charter, the de-

---

[1]. If, for example, it was proved that a $25,000 profit on a charter leaving from Korea was foreseen by the parties at the time of contracting and this figure were added to the substitute's special expenses, the total of expenses attributable to performance of the substitute would come to $135,874. This would leave, as a balance applicable to general expenses, $16,436. When prorated onto a 38½ day period, the allocated contribution would come to $7,716.94. This means that, under the majority's formula, $50,418.06 would be added to the anticipated profit instead of the present figure of $38,680.18. The plaintiff would, therefore, realize only $11,737.88 of his $25,000 loss.

fendant should be charged with whatever loss ensued from the substitute.

"A breach of contract may cause loss as well as prevent gain," Restatement, Contracts § 329, comment g, and the breach in this case prevented a gain of $34,955.50 and caused a loss of the deficit on the substitute which amounted to $71,735. If the loss for all 82 days were added to the anticipated profit, the total recovery would be $106,790.

## II.

We have in earlier cases, however, approved a prorating formula for determining profits made on a substitute charter which lasted beyond the period which was to be covered by the original. United Transportation Co. v. Berwind-White Coal-Mining Co., 2 Cir., 1926, 13 F.2d 282. Whether prorating is proper when it is a loss that is being accounted for is not entirely beyond controversy. However, the reason for crediting a defendant with merely a daily portion of a profit realized on a substitute contract such as that in Berwind-White seems equally persuasive in the case of a loss. Just as it is too speculative to presume that beyond the period of the original charter, had it been performed, the plaintiff could not have made profits in excess of what he realized on the substitute, it is uncertain whether a plaintiff would not, in fact, have suffered greater losses than he did under the substitute if the original charter had been performed. Thus, I conclude that it is equitable to apply the prorating rule to the losses in this case, in view of the record before us.

The majority, however, would prorate only the "overhead" expenses of the type which would have been incurred had the plaintiff stayed in port. I cannot agree with the reasoning which results in such a calculation.

Several unexpressed premises underlie this computation. First, by drawing the line where he does, Judge FRIENDLY assumes that a shipowner such as the plaintiff ordinarily bears overhead costs in an amount equal to the expenses of maintaining an idle ship. The facts of this very case, however, indicate that this is not true. When notified that the charter could not be performed, the plaintiff accepted a substitute, although it committed him to a daily out-of-pocket loss of over $800. The "overhead" of a ship is not at all like that of a haberdasher; it may be, as the stipulated figures regarding the cancelled charter indicate, the major portion of the cost to the shipowner of performing the service for which he is hired. Apparently, a shipowner whose vessel is unemployed in port for any substantial length of time suffers prohibitive losses, and it is more desirable for the owner to accept a losing charter which defrays some of the overhead costs than to wait idly in port. It is, therefore, erroneous to distinguish between the expenses incurred in port and the costs attributable to travel. To compute "savings" by hypothesizing expenses had the ship not moved from its dock is to adopt an unrealistic contrast.

Second, the majority's computation cloaks an assumption that the non-overhead expenses of the last 43½ days of the substitute charter would not have been suffered had the original charter not been cancelled. As to fuel, this seems highly unlikely, since the ship might well have been employed elsewhere. Nor does it seem probable that other loading and discharge would not have been done. These expenses might, of course, have been balanced by freight payments for subsequent charters, but the entire computation is at best speculative. It is no more reasonable to assume that had the charter not been cancelled all later contracts would have been profitable ones than to assume that some might have resulted in losses.

Third, the classification of various items of expenditure into the overhead and non-overhead, or in-port and travel,

categories involves the court in confusion and speculation. An accurate calculation would require, as Judge FRIENDLY admits, that fuel costs for the stay in port be classified as overhead. Moreover, the majority assumes that the other overhead expenses would be the same in port as at sea, and speculates as to the allocation of the total-daily-expense figure of $1,510 provided for in the stipulation. If there were no stipulation, the majority's decision here would require the district court to decide not only what the total expense of the cancelled charter would have been, but to allocate the hypothetical figures by determining—at a second hypothetical remove—what would have been spent had the ship stayed in port.

I would, therefore, compute the daily loss on the entire substitute charter just as did the commissioner in Berwind-White with regard to daily profits. When multiplied by the 38½ days for which the original charter is accountable, the total prorated loss comes to $33,680.19. This sum should be added to the anticipated profit for a damage figure of $68,635.69, almost $5,000 less than the majority's award. In an area in which the computation of damages is, as Judge FRIENDLY concedes, approximate at best, this method has the merit of simplicity and avoids the hairline distinctions between overhead expenses and those which would not have been incurred "regardless of performance."

It might appear anomalous that this dissenter, while objecting to the majority's formulation as too restrictive from the plaintiff's point of view, would emerge with a damage award smaller than that of the majority. However, this result follows from the fact that the substitute charter was undertaken for a period considerably longer than that which was planned under the cancelled charter, and from the rule requiring us to prorate the loss.